321 S.E.2d 302

Penelope P. BAILEY, Wilma A. Beckett, George E. Lantz, William R. Leachman and Susan L. Lowther, individually and as members of the Wood County Board of Education

v.

Roy TRUBY, as State Superintendent of Schools and The West Virginia Board of Education, a corporation.

Rodney A. MYLES, a person under the age of eighteen (18) years who sues by Ruth Ella Myles, his mother and next friend

v.

The BOARD OF EDUCATION OF the COUNTY OF KANAWHA, a corporation.

Nos. 16155, 16140.

Supreme Court of Appeals of West Virginia.

July 11, 1984.

Dissenting Opinion Sept. 26, 1984.

George E. Lantz, David G. Palmer, Lantz, Rudolph & Palmer, Parkersburg, for petitioners in No. 16155.

Marianne K. Hoover, Asst. Atty. Gen., Charleston, for respondents in No. 16155.

Charles A. Riffee, II, Thomas & Riffee, St. Albans, for appellants in No. 16140.

John O. Kizer and Howard G. Salisbury, Jr., Love, Wise & Woodroe, Charleston, for appellee in No. 16140.

McGRAW, Justice:

These two actions, consolidated for decision and disposition, concern the validity of academic eligibility requirements for participation in nonacademic extracurricular activities. The first is a petition for a writ of mandamus by the Wood County Board of Education, and its individual members, seeking to compel the withdrawal of a rule promulgated by the State Board of Education that requires students to maintain a 2.0, or "C," grade point average in order to participate in extracurricular activities. The second is an appeal by Rodney A. Myles, who is a student at St. Albans High School, through his mother and next friend, Ruth Ella Myles, from the denial of injunctive relief sought in the Circuit Court of Kanawha County to prohibit enforcement of a Kanawha County Board of Education rule requiring students to receive passing grades in all of their classes, in addition to the requirement that they maintain a 2.0 grade point average, in order to participate in nonacademic extracurricular activities. Because the Myles appeal involves a heightened standard of academic achievement as a prerequisite to participation in extracurricular activities, we will first address the Wood County Board of Education challenge to the State Board of Education's basic 2.0 grade point average policy.

I.

On August 12, 1983, the State Board of Education adopted a new policy governing academic and attendance requirements for participation in extracurricular activities. This policy was filed in the Secretary of State's office on November 1, 1983, to take effect at the end of the first semester of the 1983–84 school year. It is but one part of a series of policies adopted by the State Board of Education categorized under the heading "Educational Program Development."

■ "Extracurricular activities" are defined in the rule as "those student activities which extend beyond class instruction and include a variety of special interest groups and events, e.g., student government, class officers, student publications, drama productions, music productions, debate tournaments, interscholastic athletics, and cheerleading." Despite this broad definition of the term "extracurricular activities," we expressly limit our holdings in these actions to "nonacademic" extracurricular activities, such as interscholastic athletics and cheerleading. On the other hand, because they are closely related to identifiable academic courses of study, and serve to complement academic curricular activities, students may not be excluded, on the basis of grade point average, from vocational, linguistic, mathematic, scientific, forensic, theatrical, musical, journalistic, and other similar academic extracurricular activities.* In order to emphasize this point, we will refer to "nonacademic extracurricular activities" throughout the opinion when appropriate.

The eligibility section of the rule promulgated by the State Board of Education reads as follows:

In order to participate in the extracurricular activities to which this policy applies, a student must:

---

* By applying the doctrine of "least intrusive remedy" in limiting application of the two rules to nonacademic extracurricular activities, it will be unnecessary for the respective boards of education to amend their rules. For other applications of the "least intrusive remedy" doctrine, *see* Syl. pt. 2, *Anderson's Paving, Inc. v. Hayes,* 170 W.Va. 640, 295 S.E.2d 805 (1982); Syl. pt. 2, *Weaver v. Shaffer,* 170 W.Va. 107, 290 S.E.2d 244 (1980); Syl. pt. 2, *State ex rel. S.M.B. v. D.A.P.,* 168 W.Va. 455, 284 S.E.2d 912 (1981).

(1) maintain a 2.0 average

a. A 2.0 average is defined as a grade-point average (GPA) of 2.0 or better on a scale where an "A" mark earns 4 points, a "B" is awarded 3 points, a "C" is worth 2 points, a "D" is given a value of 1 point, and an "F" is worth 0 points.

b. In computing a student's "grade-point average" (GPA) for purposes of this policy, all subjects undertaken by the student and for which a final grade is recorded are to be considered. The total number of classes taken is divided into the total number of "grade points" earned to determine the GPA. Classes for which a pass/fail is awarded will be included in computing the GPA only if the student failed the class.

c. The student's eligibility will be determined for each semester by his or her GPA the previous semester.

d. In the case of handicapped students, grades received from placements in regular classrooms and special education classrooms should be included when computing the GPA. For handicapped students placed in ungraded programs, consideration should be given to their achievement in those programs.

AND

(2) meet state and local attendance requirements

a. Students must meet the attendance requirement in Graduation Requirements for West Virginia Public Schools: Adolescent Education (Grades 9–12) of a full day for students in the first three years of grades 9–12 and at least four class periods in the fourth year of grades 9–12.

b. Students must meet the attendance requirements of local boards of education.

This rule applies "to extracurricular activities in grades 7–12."

After receiving a memorandum dated January 19, 1984, from respondent Roy Truby, State Superintendent of Schools, reminding those involved in the implementation of the new academic eligibility standard that it would become effective at the end of the first semester of the 1983–84 school year, the Wood County Board of Education voted unanimously on January 31, 1984, to refuse to implement this new policy. The petitioners state that this action was taken "[b]ecause of considerable concern as to the merits of the subject policy and as to the authority of [the State Board of Education] to enact such a policy." Therefore, the principals and administrators of secondary schools in Wood County were directed by the Wood County Board of Education not to implement the new policy. On February 6, 1984, the petitioners voted unanimously to seek a ruling from this Court as to whether the respondents have the legal authority to adopt and enforce the new academic eligibility policy.

A.

Initially, this Court must address the propriety of mandamus as an appropriate remedy for the relief sought by the petitioners. The basic requirements for the issuance of a writ of mandamus are well established in this jurisdiction. In Syllabus Point 2 of *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969), this Court stated: "A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy." *See also Reed v. Hansbarger*, 173 W.Va. 258, 314 S.E.2d 616, 619–20 (1984), and cases cited therein. The first two elements of this formula require an analysis of the legal rights and duties of the respective parties. At this point, it is sufficient that the petitioners are charged with the implementation of the new policy, and challenge the authority of the respondents to order its implementation. As to the third element, although the respondents contend that the "petitioners obviously have other remedies to pursue which would be more effective," they fail to identify any of these

alternate adequate avenues of relief available to the petitioners.

■ The respondents also contend that mandamus is inappropriate in this case because the promulgation of the new policy has already taken place. Several of our cases have recognized, however, that mandamus may be utilized to challenge the validity or the constitutionality of administrative regulations or statutes already in effect. *See Myers v. Barte,* 167 W.Va. 194, 279 S.E.2d 406, 408–09 (1981); *State ex rel. McCamic v. McCoy,* 166 W.Va. 572, 276 S.E.2d 534, 535, 539 n. 6 (1981); *State ex rel. West Virginia Housing Development Fund v. Copenhaver,* 153 W.Va. 636, 638, 171 S.E.2d 545, 547 (1969); *State ex rel. Sheldon v. City of Wheeling,* 146 W.Va. 691, 695, 122 S.E.2d 427, 429 (1961); *Carter v. City of Bluefield,* 132 W.Va. 881, 54 S.E.2d 747, 757 (1949); *see also State ex rel. Ammerman v. City of Philippi,* 136 W.Va. 120, 65 S.E.2d 713 (1951); *State ex rel. Tucker v. City of Wheeling,* 128 W.Va. 47, 35 S.E.2d 681 (1945); *Austin v. Thomas,* 96 W.Va. 628, 123 S.E. 590 (1924).

■ The respondents final argument in support of the proposition that mandamus is inappropriate in this case is that because policy-making by the State Board of Education is a discretionary function, mandamus does not lie in the absence of a showing of "caprice, passion, partiality, fraud, arbitrary conduct, some ulterior motive, or misapprehension of law." *See* Syl. pt. 5, *State ex rel. Withers v. Board of Education,* 153 W.Va. 867, 172 S.E.2d 796 (1970); *Cochran v. Trussler,* 141 W.Va. 130, 134, 89 S.E.2d 306, 309 (1955); *State ex rel. Ward v. Raleigh County Court,* 138 W.Va. 551, 555–56, 76 S.E.2d 579, 582 (1953); Syl. pt. 1, *State ex rel. Payne v. Board of Education,* 135 W.Va. 349, 63 S.E.2d 579 (1951); Syl. pt. 3, *State ex rel. Conley v. Pennybacker,* 131 W.Va. 442, 48 S.E.2d 9 (1948); Syl., *Walden v. State Compensation Commissioner,* 113 W.Va. 307, 167 S.E. 743 (1933); Syl. pt. 1, *State ex rel. Noyes v. Lane,* 89 W.Va. 744, 110 S.E. 180 (1921). Fundamental to the petitioner's request for a writ of mandamus, however, is the contention that the respon-

dent's promulgation of the policy in question, even if discretionary, arises from a misapprehension of its legal authority to control extracurricular activities. Therefore, the appropriateness of mandamus in this case turns on the legal rights and duties of the respective parties.

### B.

Article XII, § 2 of the West Virginia Constitution (1982 Replacement Vol.) provides: "The general supervision of the free schools of the State shall be vested in the West Virginia board of education which shall perform such duties as may be prescribed by law." In defining these duties, the Legislature has provided that "Subject to and in conformity with the constitution and laws of this State, the state board of education shall determine the educational policies of the State and shall make such rules for carrying into effect the laws and policies of the State relating to education ...." West Virginia Code § 18–2–5 (1984 Replacement Vol.). This broad grant of rule-making authority extends to "such other matters pertaining to the public schools of the State as may seem to the state board to be necessary and expedient." West Virginia Code § 18–2–5 (1984 Replacement Vol.). In determining the validity of rules and regulations promulgated by the State Board of Education pursuant to this broad legislative grant of rule-making authority, this Court has stated, "The determination of the educational policies of the public schools of the State is vested in The West Virginia Board of Education, and, unless unreasonable or arbitrary, its actions relating to such policies will not be controlled by the courts." Syl. pt. 1, *Detch v. Board of Education,* 145 W.Va. 722, 117 S.E.2d 138 (1960).

The petitioners, however, do not question the reasonableness of the academic eligibility rule. Instead, they rely on language contained in West Virginia Code § 18–2–25 (1984 Replacement Vol.), which provides that "The county boards of education are hereby granted and shall exercise the control, supervision and regulation of all interscholastic events, and other extracurricular

activities of the students in public secondary schools, and of said schools of their respective counties." The petitioners do not challenge the respondents' authority to promulgate academic or attendance rules and regulations. They do contend, however, that because the rule is primarily one governing participation in extracurricular activities, it is an invalid interference with their own exclusive right to control, supervise, and regulate extracurricular activities under West Virginia Code § 18–2–25 (1984 Replacement Vol.). In support of this contention, they emphasize that the Legislature's grant of rule-making authority to the State Board of Education is expressly made "[s]ubject to and in conformity with the ... laws of this State," West Virginia Code § 18–2–25 (1984 Replacement Vol.), and that "[a] specific section of a statute controls over a general section of the statute," Syl. pt. 2, *State ex rel. Myers v. Wood,* 154 W.Va. 431, 175 S.E.2d 637 (1970); *see also Cropp v. State Workmen's Compensation Commissioner,* 160 W.Va. 621, 626, 236 S.E.2d 480, 484 (1977); *State ex rel. Sahley v. Thompson,* 151 W.Va. 336, 340, 151 S.E.2d 870, 872 (1966); *Elite Laundry Co. v. Dunn,* 126 W.Va. 858, 866, 30 S.E.2d 454, 459 (1944); Syl. pt. 4, *Kelley & Moyers v. Bowman,* 68 W.Va. 49, 69 S.E. 456 (1910).

### C.

Therefore, the issue in the present case narrows to whether the academic eligibility rule promulgated by the State Board of Education is invalidated by the legislative grant of the control, supervision, and regulation of extracurricular activities to county boards of education under West Virginia Code § 18–2–25 (1984 Replacement Vol.).

In 1960, this Court was faced with a similar issue in *Detch v. Board of Education, supra.* That case involved a conflict between West Virginia Code § 18–5–15 (1966 Replacement Vol.) which, at that time, provided "The school shall be open to youths between the ages of six and twenty-one" and a rule promulgated by the State Board of Education which provided that "the school entrance age ... shall be 6 years of age prior to November 1 of the current school year." Ethel Detch, the petitioner, would have been six years old on November 3 of the school year in question. Therefore, under West Virginia Code § 18–5–15 (1966 Replacement Vol.), she sought to compel her admission into the first grade on the theory that children attaining the age of six at any time during the school year were entitled to admission.

In concluding that the State Board of Education had the authority to promulgate regulations governing the age children would be permitted to attend public school in West Virginia, despite the relatively clear language of the statute involved, this Court stated:

> The people, by the Constitution, have provided not only for a free school system, but that the system must be "thorough and efficient". [W.Va. Const. art. XII, § 1]. The Legislature is expressly commanded to provide such a system "by general law." [W.Va. Const. art. XII, § 2]. It has attempted to do so, in part, by the statutory provisions cited above, and of no little significance is the statutory provision directing The West Virginia Board of Education to "make rules for carrying into effect the laws and policies of the State relating to education". [W.Va.Code § 18–2–5].... Of course, it can not be contended that the granting of such authority to the state board empowers it to promulgate rules contrary to clearly expressed legislative enactments within constitutional limitations, but the wide discretion vested in the state board makes it the duty of the courts to attempt to reconcile the intended meaning of such a resolution with existing legislative provisions, where to do so would not violate a valid, clearly expressed legislative enactment.

*Detch,* 145 W.Va. at 728–29, 117 S.E.2d at 142.

In contrast to this expansive interpretation of the power and authority of the State Board of Education, this Court has traditionally construed the power and authority of the county boards of education in a very narrow fashion. In Syllabus Point 4 of

*Shinn v. Board of Education,* 39 W.Va. 497, 20 S.E. 604 (1894), this Court held that:

The board of education of a school district is a corporation created by statute, with functions of a public nature expressly given, and no other; and it can exercise no power not expressly conferred, or fairly arising from necessary implication, and in no other mode than that presented or authorized by statute.

*See also* Syl. pt. 1, *Evans v. Hutchinson,* 158 W.Va. 359, 214 S.E.2d 453 (1975); *State v. Rouzer,* 127 W.Va. 392, 397, 32 S.E.2d 865, 867 (1945); *Board of Education v. Commercial Casualty Insurance Co.,* 116 W.Va. 503, 506, 182 S.E. 87, 89 (1935); Syl. pt. 1, *Dooley v. Board of Education,* 80 W.Va. 648, 93 S.E. 766 (1917); Syl. pt. 2, *Herald v. Board of Education,* 65 W.Va. 765, 65 S.E. 102 (1909); Syl. pt. 1, *Honaker v. Board of Education,* 42 W.Va. 170, 24 S.E. 544 (1896). Similarly, in a concurring opinion by Judge Maxwell in *Brown v. Board of Education,* 106 W.Va. 476, 485, 146 S.E. 389, 392 (1929), the general observation is made that " 'School districts ... [have] been said to be corporations of the most limited power known to the law.' " *Quoting* 24 Ruling Case Law 565 (1919); *see also Pasadena School District v. City of Pasadena,* 166 Cal. 7, 11, 134 P. 985, 986 (1913); *Monaghan v. School District No. 1, Clackamas County,* 211 Or. 360, 374, 315 P.2d 797, 804 (1957); 68 Am.Jur.2d *Schools* § 15 (1973).

### D.

As previously noted, the West Virginia Constitution vests the State Board of Education with the power of "general supervision" over the state's system of free schools. West Virginia Constitution art. XII, § 2 (1982 Replacement Vol.). Although this Court has not addressed what is meant by the term "general supervision" in this context, the Kansas Supreme Court, in a case involving a substantially similar constitutional provision, has discussed the issue at length.

In *State ex rel. Miller v. Board of Education,* 212 Kan. 482, 511 P.2d 705 (1973), the constitutional provision at issue stated, "The legislature shall provide for a state board of education which shall have general supervision of public schools, educational institutions and all the educational interests of the state .... The state board of education shall perform such other duties as may be provided by law." Kan. Const. art. 6, § 2(a). As in the present case, *Miller* involved a conflict between the state board of education and a local school board over the validity of certain regulations promulgated by the state board. *Id.* at 483–84, 511 P.2d at 707–08. The local school board challenged the regulations, governing school conduct, on the grounds that the Kansas State Board of Education lacked authority to enact or enforce such regulations, and that the regulations impermissibly encroached upon their own constitutional authority. *Id.* at 486, 511 P.2d at 709. The Kansas State Board of Education, on the other hand, contended that the regulations were a valid exercise of their right of "general supervision" over the state's educational system under the Kansas Constitution. *Id.*

The first issue raised in *Miller* was whether article 6, § 2(a) of the Kansas Constitution was self-executing, or whether the Kansas State Board of Education's authority to exercise "general supervision" over the state's educational system could be thwarted by legislative failure to adopt enabling legislation. In addressing this issue, the Kansas Supreme Court held in Syllabus Point 6 of *Miller* that "That part of article 6, § 2(a) of the Kansas Constitution granting to the state board of education authority to exercise general supervision of the public schools, educational institutions and educational interests of the state ... is self-executing in effect."

The second issue raised in *Miller* was whether the legislature could limit the state board of education's general supervisory powers by statute. In addressing this issue, the Kansas Supreme Court held in Syllabus Point 7 of *Miller* that "Where a constitutional provision is self-executing the legislature may enact legislation to facilitate or assist in its operation, but whatever legislation is adopted must be in har-

mony with and not in derogation of the provisions of the constitution."

The final issue raised in *Miller* was the meaning of the term "general supervision" as used in the constitutional provision in question. After examining definitions found in recognized lexicographies and in cases from other jurisdictions, and with reference to the context of the term within the constitutional provision involved, the Kansas Supreme Court held in Syllabus Point 9 of *Miller* that "As used in article 6, § 2(a) of the Kansas Constitution, general supervision means the power to inspect, to superintend, to evaluate, to oversee for direction." Despite this relatively broad interpretation of the term "general supervision," the Kansas Supreme Court did recognize that the term does not imply unlimited authority. In Syllabus Point 10 of *Miller,* the Kansas Supreme Court stated that "As found and employed both in the constitution and in the statutes of this state the term 'general supervision' means something more than to advise and confer with but something less than to control."

Therefore, the Kansas Supreme Court concluded that the regulation promulgated by the Kansas State Board of Education governing school conduct was a valid exercise of its powers of general supervision. *Miller,* 212 Kan. at 492, 511 P.2d at 713.

### E.

Although not cited by either of the parties to this mandamus action, we find the cited reasoning of the Kansas Supreme Court in *Miller* persuasive. In Syllabus Point 3 of *Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859 (1979), this Court stated, "The mandatory requirements of 'a thorough and efficient system of free schools' found in Article XII, Section 1 of the West Virginia Constitution, make education a fundamental, constitutional right in this State." In defining what is meant by the term "a thorough and efficient system of free schools," this Court stated in *Pauley,* 162 W.Va. at 705, 255 S.E.2d at 877, that "It develops, as best the state of education expertise allows, the minds, bodies and social morality of its charges to prepare them

for useful and happy occupations, recreation and citizenship, and does so economically." In addition to the emphasis in *Pauley* on the fundamental right to a quality education, we also stressed the importance of an equal opportunity to a quality education, stating that "our thorough and efficient constitutional mandate requires something more than a mere equality of educational funding to the counties." *Id.,* 162 W.Va. at 716, 255 S.E.2d at 882.

The State Board of Education, charged with the general supervision of our state's educational system, has a duty to ensure that the constitutionally mandated educational goals of quality and equality are achieved. In furtherance of these goals, it adopted, as part of its "Educational Program Development," a uniform academic and attendance extracurricular eligibility policy designed to encourage academic excellence throughout the state.

Although, as previously discussed, West Virginia Code § 18–2–25 (1984 Replacement Vol.) provides that "The county boards of education ... shall exercise the control, supervision and regulation of all interscholastic events, and other extracurricular activities," as this Court stated in *State ex rel. Brotherton v. Blankenship,* 157 W.Va. 100, 125, 207 S.E.2d 421, 436 (1973): "a thorough and efficient system of free schools is of paramount importance in a free society and ... neither the Legislature nor the executive branch of government may perform any act which would result in the elimination of this safeguard."

The petitioners argue that the Legislature, in enacting West Virginia Code § 18–2–25 (1984 Replacement Vol.), intended to vest exclusive authority in county boards of education with respect to the regulation of extracurricular activities. First, such a result does not appear to be what the Legislature intended. Second, even if such a result was intended by the Legislature, it must fail to the extent that it interferes with the State Board of Education's exercise of general supervision over our state's educational system.

### F.

Several factors indicate that the Legislature did not intend to vest exclusive control of extracurricular activities with county boards of education.

First, West Virginia Code § 18–2–25 (1984 Replacement Vol.) is not part of article 5, chapter 18 of the Code, dealing with the structure and function of county boards of education. Rather, it is part of article 2, chapter 18 of the Code, dealing with the structure and function of the State Board of Education. This indicates that the Legislature assumed that, prior to the enactment of West Virginia Code § 18–2–25 (1984 Replacement Vol.), exclusive control of extracurricular activities vested in the State Board of Education. Further evidence of this legislative assumption that control over extracurricular activities rested with the State Board of Education results from the fact that two years prior to the legislative enactment of West Virginia Code § 18–2–25 (1984 Replacement Vol.), this conclusion was also reached in a 1965 Attorney General's opinion. *See* 51 Op. Att'y Gen. 208 (1965). The Legislature was merely supplementing the State Board of Education's authority to regulate extracurricular activities by enabling local school boards to fill in the details where State Board of Education extracurricular activity regulations proved inadequate.

A second factor that supports the conclusion that the Legislature did not intend to vest exclusive control of extracurricular activities with county boards of education involves the delegation of that authority to the West Virginia Secondary School Activities Commission. Although West Virginia Code § 18–2–25 (1984 Replacement Vol.) provides that "The county board of education may delegate such control, supervision and regulation of interscholastic athletics and band activities to the 'West Virginia secondary school activities commission,'" the statute also provides that *"The rules and regulations of the West Virginia secondary school activities commission shall ... in all instances be subject to the prior approval of the state board."*

(Emphasis added). This clearly indicates that the Legislature did not intend to eliminate State Board of Education involvement in the regulation of extracurricular activities. In fact, it evidences a legislative intention that, particularly where more generalized types of extracurricular regulations are involved, the State Board of Education has the ultimate authority to set minimum extracurricular activity standards.

Finally, the existence of other statutory provisions governing the interrelationship between the State Board of Education and county boards of education indicates that the Legislature intended to permit county board of education regulation of extracurricular activities subject to the general supervision of the State Board of Education. For example, West Virginia Code § 18–2–5 (1984 Replacement Vol.) provides that "the state board of education ... shall make rules for carrying into effect the laws and policies of the State relating to education, including rules relating to ... the general powers and duties of county boards of education ...." Although this grant of rule-making authority is tempered by a requirement that it be exercised in conformance with other statutory provisions, it is indicative of the broad power of the State Board of Education over county boards of education, particularly in the area of state educational policy.

Another example of the State Board of Education's power of supervision over county boards of education is found in West Virginia Code § 18–5–13 (1984 Replacement Vol.), which enumerates some of the general powers of county boards of education. It provides that the exercise of these general powers by county boards of education are "subject to ... the rules and regulations of the state board." In addition to this general provision relating to county board of education compliance with State Board of Education rules and regulations, there are a number of other statutory provisions requiring such compliance in specific circumstances or requiring State Board of Education approval of county board of education activity. *See, e.g.*, West Virginia Code §§ 18–2–23 (requiring the

state superintendent's approval of county comprehensive educational program plans); 18–2A–5 (requiring county selection of textbooks from a list approved by State Board of Education); 18–4–10 (requiring county school superintendents to "execute under the direction of the state board all its educational policies"); 18–5–10 (requiring county submission of all building plans and specifications to the State Board of Education for approval); 18–5–15a (requiring the compliance of county multicultural education programs with State Board of Education rules and regulations); 18–5–18 (requiring the conformance of county kindergarten programs with State Board of Education guidelines and criteria); 18–5–18a (requiring the conformance of exceptions made to county teacher/pupil ratio ceilings with guidelines established by the State Board of Education); 18–5–19 (requiring the conformance of county night and vocational educational programs with rules and regulations established by the State Board of Education); 18–5–19c (requiring the conformance of county veteran and adult educational programs with regulations established by the State Board of Education); 18–5–21e (requiring the conformance of county care, distribution, and use of free textbooks with rules and regulations promulgated by the State Board of Education); 18–5–37 (requiring the conformance of county school breakfast programs with standards established by the State Department of Education) (1984 Replacement Vol.).

The Legislature, in enacting West Virginia Code § 18–2–25 (1984 Replacement Vol.), could not have ignored the pervasive supervisory authority of the State Board of Education over county boards of education. Therefore, it is unlikely that it intended to vest the exclusive control, supervision, and regulation of extracurricular activities with county boards of education. Instead, it is more likely that, as with other county board of education activities, the legislative grant of authority found in West Virginia Code § 18–2–25 (1984 Replacement Vol.) was made implicitly subject to the general supervisory authority of the State Board of Education.

### G.

As previously mentioned, even if this was not the intention of the Legislature in enacting West Virginia Code § 18–2–25 (1984 Replacement Vol.), such grant of authority over extracurricular activities must fail to the extent that it interferes with the State Board of Education's constitutional exercise of "general supervision" over our state's educational system. As noted by the Kansas Supreme Court in Syllabus Point 7 of *Miller, supra,* and by this Court in *State ex rel. Brotherton v. Blankenship, supra,* constitutional grants of authority and the provision of fundamental safeguards cannot be derogated or eliminated by legislative or executive action. Therefore, any statutory provision that interferes with the State Board of Education's "general supervision of the free schools of the State" under article XII, § 2 of the West Virginia Constitution is void.

Under article XII, § 1 of the West Virginia Constitution, the pursuit of academic excellence is the cornerstone of our state's educational policy. In the exercise of its power of "general supervision" over our state's educational system, the State Board of Education has determined that academic and attendance requirements for participation in extracurricular activities will further this fundamental educational goal. County boards of education may not utilize their powers of control, supervision, and regulation of nonacademic extracurricular activities to impede its attainment. We therefore hold that that the State Board of Education's promulgation of a rule requiring students to maintain a 2.0 grade point average in order to participate in nonacademic extracurricular activities is a legitimate exercise of its power of "general supervision" over the state's educational system under Article XII, § 2 of the West Virginia Constitution in furtherance of the fundamental educational goal of academic excellence.

### II.

On October 24, 1983, the Kanawha County Board of Education adopted a new policy

governing academic and attendance requirements for participation in extracurricular activities. The effective date of this new policy was the end of the first semester of the 1983–84 school year. Its language tracks that of the State Board of Education's academic and attendance extracurricular eligibility policy with one important exception. The Kanawha County Board of Education rule provides that "In order to participate in the extracurricular activities to which this policy applies, a student must [receive] [n]o failing grade in any subject area."

The appellant, Rodney A. Myles, is a student at St. Albans High School, and has participated in interscholastic athletics as a member of the school's basketball team. Although the appellant maintained a 2.0 grade point average in compliance with the State Board of Education policy, he received a failing grade in English, thereby making him ineligible for participation in extracurricular activities under the additional Kanawha County Board of Education requirement.

On January 30, 1984, the appellant, through his mother and next friend, Ruth Ella Myles, filed a petition for injunctive relief in the Circuit Court of Kanawha County. He contended that the action of the Kanawha County Board of Education in declaring him ineligible to participate in extracurricular activities (1) constituted a denial of equal protection under the fourteenth amendment to the United States Constitution, and (2) violated his procedural and substantive due process rights under the fourteenth amendment and article III, § 10 of the West Virginia Constitution. The appellant further alleged that even if he was entitled to an administrative review of the board's decision, such review could not be completed in time to prevent the irreparable harm that would occur if he was unable to play basketball.

A hearing in the matter was held in the Circuit Court of Kanawha County on January 31, 1984. At the conclusion of this hearing, the circuit court denied the appellant's request for a temporary injunction, primarily because it felt that the extracurricular eligibility policy was a reasonable exercise of the Kanawha County Board of Education's authority under West Virginia Code § 18–2–25 (1984 Replacement Vol.). That same day, the Kanawha County Board of Education filed a motion to dismiss the action pursuant to Rule 12(b)(6) of the West Virginia Rules of Civil Procedure. Thereafter, on February 2, 1984, the court entered an order dismissing the appellant's action. That same day, the appellant filed another petition for injunctive relief in this Court. The petition addressed to this Court, however, is being treated as an appeal from the judgment of the Kanawha County Circuit Court dismissing the appellant's petition for injunctive relief for failure to state a cause of action upon which relief might be granted.

The appellant raises several issues on appeal. First, he contends that the Kanawha County Board of Education academic eligibility rule violates his procedural due process rights under the federal and state constitutions. Second, he alleges that the rule violates his substantive due process rights under the federal and state constitutions. Third, he asserts that West Virginia Code § 18–2–25 (1984 Replacement Vol.) violates his rights to equal protection and to a thorough and efficient education under the federal and state constitutions. Fourth, he argues that West Virginia Code § 18–2–25 (1984 Replacement Vol.) violates our state constitutional prohibition against special legislation. Finally, the appellant maintains that the exclusive authority to enact and enforce academic eligibility standards for participation in extracurricular activities vests, not with county boards of education, but with the State Board of Education. We will address each of these issues in turn.

A.

Article III, § 10 of the West Virginia Constitution provides that "No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers." Therefore, as this Court stated in *Clarke v. West Virginia Board of Regents*, 166 W.Va. 702, 279

S.E.2d 169, 175 (1981): "The threshold question in any inquiry into a claim that an individual has been denied procedural due process is whether the interest asserted by the individual rises to the level of a 'property' or 'liberty' interest protected by Article III, Section 10 of our constitution."

When confronted with this precise issue, the overwhelming majority of courts have held that participation in interscholastic athletics or other extracurricular activities is not a constitutionally protected liberty or property interest. *See Niles v. University Interscholastic League,* 715 F.2d 1027, 1031 (5th Cir.1983); *Hebert v. Ventetuolo,* 638 F.2d 5, 6 (1st Cir.1981); *Walsh v. Louisiana High School Athletic Association,* 616 F.2d 152, 159 (5th Cir. 1980); *Denis J. O'Connell High School v. Virginia High School,* 581 F.2d 81, 84 (4th Cir.1979); *Moreland v. Western Pennsylvania Interscholastic Athletic League,* 572 F.2d 121, 123–24 (3d Cir.1978); *Colorado Seminary (University of Denver) v. NCAA,* 570 F.2d 320, 321 (10th Cir.1978); *Hamilton v. Tennessee Secondary School Athletic Association,* 552 F.2d 681, 682 (6th Cir.1976); *Albach v. Odle,* 531 F.2d 983, 984–85 (10th Cir.1976); *Parish v. NCAA,* 506 F.2d 1028, 1034 (5th Cir.1975); *Mitchell v. Louisiana High School Athletic Association,* 430 F.2d 1155, 1158 (5th Cir.1970); *Oklahoma High School Athletic Association v. Bray,* 321 F.2d 269, 273 (10th Cir.1963); *Justice v. NCAA,* 577 F.Supp. 356, 366 (D.Ariz.1983); *Park Hills Music Club, Inc. v. Board of Education,* 512 F.Supp. 1040, 1043 (S.D.Ohio 1981); *Blue v. University Interscholastic League,* 503 F.Supp. 1030, 1034–35 (N.D.Tex.1980); *Williams v. Hamilton,* 497 F.Supp. 641, 645 (D.N.H.1980); *Ward v. Robinson,* 496 F.Supp. 1, 1–2 (E.D.Tenn.1978); *Kite v. Marshall,* 494 F.Supp. 227, 232 (S.D.Tex. 1980), *rev'd on other grounds,* 661 F.2d 1027 (5th Cir.1981); *Fluitt v. University of Nebraska,* 489 F.Supp. 1194, 1202–03 (D.Neb.1980); *Kulovitz v. Illinois High School Association,* 462 F.Supp. 875, 877–78 (N.D.Ill.1978); *Yellow Springs Exempted Village School District v. Ohio High School Athletic Association,* 443 F.Supp. 753, 758 n. 37 (S.D.Ohio 1978), *rev'd on other grounds,* 647 F.2d 651 (6th Cir.1981); *Dallam v. Cumberland Valley School District,* 391 F.Supp. 358, 361–62 (M.D.Pa. 1975); *Stock v. Texas Catholic Interscholastic League,* 364 F.Supp. 362, 364–65 (N.D.Tex.1973); *Taylor v. Alabama High School Athletic Association,* 336 F.Supp. 54, 57 (M.D.Ala.1972); *Paschal v. Perdue,* 320 F.Supp. 1274, 1276 (S.D.Fla.1970); *Scott v. Kilpatrick,* 286 Ala. 129, 133, 237 So.2d 652, 656 (1970); *Florida High School Activities Association v. Bradshaw,* 369 So.2d 398, 403 (Fla.App.1979); *Smith v. Crim,* 240 Ga. 390, 392, 240 S.E.2d 884, 886 (1977); *Haas v. South Bend Community School Corporation,* 259 Ind. 515, 521, 289 N.E.2d 495, 498 (1972); *State ex rel. Indiana High School Athletic Association v. Lawrence Circuit Court,* 240 Ind. 114, 124, 162 N.E.2d 250, 255 (1959), *overruled on other grounds, Haas v. South Bend Community School Corporation, supra; Kriss v. Brown,* 180 Ind.App. 594, 604, 390 N.E.2d 193, 199–201 (1979); *Kentucky High School Athletic Association v. Hopkins County Board of Education,* 552 S.W.2d 685, 689 (Ky.App.1977); *Chabert v. Louisiana High School Athletic Association,* 312 So.2d 343, 345 (La.App.1975); *Sanders v. Louisiana High School Athletic Association,* 242 So.2d 19, 28 (La.App. 1970); *Marino v. Waters,* 220 So.2d 802, 806 (La.App.1969); *NCAA v. Gillard,* 352 So.2d 1072, 1081 (Miss.1977); *State ex rel. Missouri State High School Activities Association v. Schoenlaub,* 507 S.W.2d 354, 359 (Mo.1974); *Menke v. Ohio High School Athletic Association,* 2 Ohio App.3d 244, 245, 441 N.E.2d 620, 624 (1981); *Morrison v. Roberts,* 183 Okl. 359, 361, 82 P.2d 1023, 1024–25 (1938); *Whipple v. Oregon School Activities Association,* 52 Or.App. 419, 423, 629 P.2d 384, 386 (1981); *Caso v. New York State Public High School Athletic Association,* 78 A.D.2d 41, 46, 434 N.Y. S.2d 60, 64 (1980); *Pennsylvania Interscholastic Athletic Association, v. Greater Johnstown School District,* 76 Pa.Commw. 65, 71, 463 A.2d 1198, 1201 (1983); *Adamek v. Pennsylvania Interscholastic Athletic Association Inc.,* 57 Pa.Commw. 261, 262, 426 A.2d 1206, 1207 (1981); *Bruce v. South*

*Carolina High School League,* 258 S.C. 546, 551–52, 189 S.E.2d 817, 819 (1972); *Tennessee Secondary School Athletic Association v. Cox,* 221 Tenn. 164, 176, 425 S.W.2d 597, 602 (1968); *Sullivan v. University Interscholastic League,* 599 S.W.2d 860, 863 (Tex.Civ.App.1980), *aff'd in part and rev'd in part on other grounds,* 616 S.W.2d 170 (Tex.1981); *Starkey v. Board of Education,* 14 Utah 2d 227, 231, 381 P.2d 718, 721 (1963); *but see Brenden v. Independent School District 742,* 477 F.2d 1292, 1299 (8th Cir.1973) ("substantial and cognizable" interest justifying application of equal protection principles); *Hall v. University of Minnesota,* 530 F.Supp. 104, 110 (D.Minn.1982) (interest in admission to degree program and potential professional basketball career sufficient to implicate due process protections); *Barnhorst v. Missouri State High School Activities Association,* 504 F.Supp. 449, 458 (W.D.Mo. 1980) (sufficient interest in participation in extracurricular activities to justify application of equal protection principles) and cases cited therein, *rev'd on other grounds,* 682 F.2d 147 (8th Cir.1982); *Pegram v. Nelson,* 469 F.Supp. 1134, 1140 (M.D.N.C.1979) (total exclusion from extracurricular activities for a lengthy period of time "could" under certain circumstances be a sufficient deprivation to implicate due process); *Moran v. School District # 7, Yellowstone County,* 350 F.Supp. 1180, 1184 (D.Mont.1972) ("right to attend school includes the right to participate in extracurricular activities" justifying application of equal protection principles); *Behagen v. Intercollegiate Conference of Faculty Representatives,* 346 F.Supp. 602, 604 (D.Minn. 1972) (economic and educational interest in intercollegiate athletics requires compliance with minimum due process standards); *Kelley v. Metropolitan County Board of Education,* 293 F.Supp. 485, 492 (M.D. Tenn.1968) (equal protection), *rev'd on other grounds,* 436 F.2d 856 (6th Cir.1970), *on remand,* 492 F.Supp. 167 (M.D.Tenn.1980); *Lee v. Florida High School Activities Association,* 291 So.2d 636, 638 (Fla.App. 1974) (denial of opportunity to establish athletic eligibility constituted a denial of due process); *French v. Cornwell,* 202 Neb. 569, 571, 276 N.W.2d 216, 218 (1979), *citing Braesch v. DePasquale,* 200 Neb. 726, 732, 265 N.W.2d 842, 845 (1978) (assuming the implication of a liberty or property interest for purposes of determining whether process given was sufficient); *Duffley v. New Hampshire Interscholastic Athletic Association, Inc.,* 446 A.2d 462, 467 (N.H.1982) (right to participate in interscholastic athletics entitled to procedural due process under New Hampshire Constitution); *see also* Comment, *Judicial Review of NCAA Decisions: Does the College Athlete Have a Property Interest in Interscholastic Athletics?,* 10 Stetson L.Rev. 483, 499–505 (1981); Note, *The NCAA, Amateurism, and the Student-Athlete's Constitutional Rights Upon Ineligibility,* 15 New Eng.L.Rev. 597, 614–622 (1980). Because participation in interscholastic athletics or other nonacademic extracurricular activities does not rise to the level of a constitutionally protected "property" or "liberty" interest, the appellant does not meet the threshold requirement under *Clarke, supra,* and therefore is not entitled to any procedural due process protections.

### B.

In *State ex rel. Harris v. Calendine,* 160 W.Va. 172, 179, 233 S.E.2d 318, 324 (1977), this Court stated that "Inherent in the due process clause of the State Constitution are both the concept of substantive due process and the concept of equal protection of the laws." Later, in *Thorne v. Roush,* 164 W.Va. 165, 261 S.E.2d 72, 74 (1979), we stated that "In order for a statute to withstand constitutional scrutiny under the substantive due process standard, it must appear that the means chosen by the Legislature to achieve a proper legislative purpose bear a rational relationship to that purpose and are not arbitrary or discriminatory." Finally, in *DeCoals, Inc. v. Board of Zoning Appeals,* 168 W.Va. 339, 284 S.E.2d 856, 858 (1981), we further stated that "If the end is legitimate, our inquiry is limited to whether the means are substantially related to that end. It is not

ours to judge the wisdom or efficacy of those chose means."

Unquestionably, the encouragement of academic excellence is a legitimate concern of the Kanawha County Board of Education. The regulation of nonacademic extracurricular activity is a common method of achieving this fundamental goal. Part of this regulatory activity traditionally includes academic achievement standards as a prerequisite to participation in nonacademic extracurricular activities, particularly in the area of interscholastic athletics. As one commentator has noted:

Since amateur athletics are ordinarily conducted as a part of the educational activities of high schools and colleges, it is also common for there to be rules which limit eligibility of those who maintain a required grade average. Such a rule will ordinarily be a proper exercise of institutional authority, because it is normally both authorized and reasonable. It will be authorized because the fostering of scholastic, not athletic, achievement is the primary objective of the academic institution, and denying participation in extracurricular activities to those who are unable to render satisfactory academic performance is directly related to that objective.

W. LOWELL, THE LAW OF SPORTS § 1.21 (1979).

Other courts faced with this issue have held that academic eligibility rules for participation in nonacademic extracurricular activities bear a rational relationship to a legitimate purpose. *See Howard University v. NCAA*, 510 F.2d 213, 221 (D.C.Cir. 1975); *Parish v. NCAA*, 506 F.2d at 1034; *Associated Students, Inc. v. NCAA*, 493 F.2d 1251, 1256 (9th Cir.1974). These three cases upheld the constitutionality of the National Collegiate Athletic Association's 1.600 rule, which required that students entering member postsecondary institutions establish a predictable grade point average by the Scholastic Aptitude Test or the American College Test of 1.600. Subsequently, the NCAA has adopted a 2.000 eligibility rule, which requires high school students to graduate with a 2.000 or better grade point average in order to be eligible for athletic financial aid and competition in their freshmen year. The purposes of this rule are stated in *Jones v. Wichita State University*, 698 F.2d 1082, 1087 (10th Cir. 1983), a suit challenging its constitutionality:

[T]o reduce the possibility of the exploitation of young athletes through the recruiting of athletes who will not be representative of an institution's student body and will probably be unable to meet the necessary academic requirements for a degree, to foster the image of collegiate athletics as sports engaged in by athletes who are first and primarily college students, and as a recognition of the possibility that any student who cannot meet the requirements of the Rule should not engage in athletics during his freshman year but should devote his full time to study.

[R., Vol. I, p. 22].

In response to Jones' equal protection challenge to this 2.000 eligibility rule, the Tenth Circuit stated, "We hold that the NCAA 2.000 rule and its attendant case interpretations are rationally related to NCAA's permissible objectives and are not violative of the equal protection clause .... " 698 F.2d at 1087. In the present action, both the rule and its purposes are similar. Because the Kanawha County Board of Education's 2.0 grade point average eligibility rule bears a rational relationship to a legitimate purpose and is not arbitrary or discriminatory, it meets the similar substantive due process standard under article III, § 10 of the West Virginia Constitution.

C.

The thrust of the appellant's equal protection argument, which is related to his right to a thorough and efficient education under *Pauley v. Kelly, supra*, is that West Virginia Code § 18-2-25 (1984 Replacement Vol.) impermissibly allows county boards of education, on their own initiative, to establish individual extracurricular activity policies, thereby undermining the recognized need for uniformity in

our state's educational system. The appellant emphasizes that this statute creates a situation whereby students with identical academic records are permitted to participate in extracurricular activities in some counties, but are not permitted to participate in others. He further contends that, under *Pauley v. Kelly*, a statute that creates a lack of uniformity in our state's educational system is subject to strict scrutiny, requiring a compelling state interest to sustain its constitutionality. The difficulty with the appellant's equal protection argument is that it derives from a misinterpretation of our holding in *Pauley v. Kelly*. Our primary concern in that case was with our state's educational financing structure, not with the specifics of state educational policy. *See* Syl. Pt. 4, *Pauley v. Kelly, supra*. Furthermore, we believe that the promotion of learning activity is indeed a compelling State interest, particularly in light of the thorough and efficient clause of article XII, § 1 of the West Virginia Constitution. Therefore, even if strict scrutiny were warranted in this case, the statute in question would pass constitutional muster.

In setting forth the equal protection standards to be applied under the federal and state constitutions, this Court stated in *Myers v. Barte*, 167 W.Va. at 195, 279 S.E.2d at 407, that:

> If a fundamental or constitutional right is involved, then the state's attempt to classify such right must be based on a compelling state interest. Where the right involved does not rise to a constitutional or fundamental level, the state must only show a rational connection to sustain its classification. *E.g., State ex rel. Bromelow v. Daniel,* [163] W.Va. [532], 258 S.E.2d 119, 120 (1979); *Pauley v. Kelley,* 162 W.Va. 672, 255 S.E.2d 859, 878 (1979); *Woodring v. Whyte,* 161 W.Va. 262, 242 S.E.2d 238, 245 (1978); *Cimino v. Board of Education,* [158] W.Va. [267], 210 S.E.2d 485, 490 (1974).

As previously discussed, there is no fundamental or constitutional right to participate in nonacademic extracurricular activities in the "liberty" or "property" interest sense for purposes of due process analysis. The appellant contends, however, that there is an extracurricular activity component to a student's right to a thorough and efficient education under article XII, § 1 of the West Virginia Constitution which rises to the level of a fundamental right to participate in extracurricular activities. Although nonacademic extracurricular activities are undoubtedly a worthwhile addition to any educational program, in *Vandevender v. Cassell,* 158 W.Va. 87, 92, 208 S.E.2d 436, 439 (1974), this Court recognized the important distinction between the constitutional right to an education and the desire to participate in extracurricular activities, stating:

> Under a "free" school system fees cannot be charged as a requirement for students to be admitted to school nor can fees be charged for any required course under the curriculum set up by the state board of education. However, this does not apply to extracurricular activities which are not necessary under the required curriculum.

We note that the Court in *Vandevender* did not address the distinction between academic and nonacademic extracurricular activities. Therefore, its dicta concerning the collection of fees in relationship to academic extracurricular activities is not dispositive. It is instructive, however, of the distinction between athletic and academic pursuits.

Participation in nonacademic extracurricular activities, including interscholastic athletics, does not rise to the level of a fundamental or constitutional right under article XII, § 1 of the West Virginia Constitution. Therefore, its regulation need only be rationally related to a legitimate purpose. As previously discussed, the Kanawha County Board of Education's 2.0 eligibility rule meets this test.

### D.

Article VI, § 39 of the West Virginia Constitution provides, in pertinent part, that "in no case shall a special act be passed, where a general law would be proper, and can be made applicable to the case ...." The appellant contends that because

West Virginia Code § 18–2–25 (1984 Replacement Vol.) permits individual county boards of education to promulgate their own extracurricular activity regulatory schemes, thereby creating a lack of uniformity between counties, it operates as a special law and is therefore unconstitutional.

The appellant's argument fails in its misconception of what constitutes a "special" law. The class involved in West Virginia Code § 18–2–25 (1984 Replacement Vol.) is not students, but counties. It applies uniformly to all counties who wish to take advantage of its provisions. As with any statute designed to grant discretionary powers to local governmental bodies, it permits flexibility in order to accommodate individualized local needs. In Syllabus Point 6 of *Atchinson v. Erwin*, 172 W.Va. 8, 302 S.E.2d 78 (1983), this Court recognized that:

> "The constitutional requirement that a law be general does not imply that it must be uniform in its operation and effect in the full sense of its terms. If a law operates alike on all persons and property similarly situated, it is not subject to the objection of special legislation or class legislation and does not violate the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States." Syllabus Point 7, *State ex rel. Heck's, Inc. v. Gates*, 149 W.Va. 421, 141 S.E.2d 369 (1965).

West Virginia Code § 18–2–25 (1984 Replacement Vol.) operates uniformly on all counties; is rationally related to the purpose sought to be accomplished; and does not violate the state constitutional provision prohibiting special laws.

### E.

▮▮▮▮ West Virginia Code § 18–2–23 (1984 Replacement Vol.) provides, in pertinent part, that "The West Virginia board of education, through the state superintendent of schools, shall establish standards and criteria especially designed to guide the development of plans for a comprehensive educational program or programs in county school systems ...." The appellant contends that this statute vests exclusive control of academic policy with the State Board of Education, and that the rule promulgated by the Kanawha County Board of Education impermissibly invades this exclusive province. Academic policy, however, as with extracurricular policy, is not the exclusive province of either the state or county boards of education. Although, under West Virginia Code § 18–2–23 (1984 Replacement Vol.), the State Board of Education, through the State Superintendent of Schools, assists counties in the development of comprehensive educational program plans and must ultimately approve of the terms of those plans, plan development still remains at the county level. This statute, as well as West Virginia Code § 18–2–25 (1984 Replacement Vol.), reflect the basic structure of our state's educational system. Although the State Board of Education in exercising its power of "general supervision" over our state's educational system must have the ultimate authority in determining educational policy, county boards of education are granted authority in specified areas to supplement state educational policy in order to accommodate local educational needs and to attain heightened levels of academic excellence.

We therefore hold that the Kanawha County Board of Education's promulgation of a rule requiring students to receive passing grades in all of their classes, in addition to the State Board of Education's 2.0 grade point average rule, in order to participate in nonacademic extracurricular activities, is a legitimate exercise of its power of "control, supervision and regulation" of extracurricular activities under West Virginia Code § 18–2–25 (1984 Replacement Vol.); does not violate students' rights to procedural due process, substantive due process, and equal protection; and does not violate the constitutional prohibition against special laws or invade the province of the State Board of Education to establish basic educational policy.

### III.

For the foregoing reasons, the Wood County Board of Education's request for a

writ of mandamus compelling the withdrawal of the State Board of Education's 2.0 grade point average extracurricular eligibility policy is denied; and the order of the Circuit Court of Kanawha County dismissing Myles' petition for injunctive relief prohibiting enforcement of the Kanawha County Board of Education rule requiring students to receive passing grades in all of their classes, in addition to the 2.0 grade point average requirement, in order to participate in extracurricular activities, is affirmed.

Writ denied.

Affirmed.

HARSHBARGER, Justice, dissenting:

The State Board's extracurricular eligibility policy essentially regulates, as the majority recognizes, all extracurricular activities. If any student in grades seven though twelve fails to achieve or maintain a 2.0 grade point average, the student cannot participate in any extracurricular activities. The Wood County Board of Education challenged the State Board's authority to enact the rule on the ground that local boards of education are vested by W.Va.Code, 18-2-25, with the exclusive right to control, supervise and regulate participation in extracurricular activities.

The majority concluded that the State Board has constitutional authority to erect an academic hurdle to participation in interscholastic *athletic* activities and other undefined nonacademic extracurricular activities, but then suggests that the State Board's policy is unlawful to the extent that it places an educational barrier limiting participation in *academic* extracurricular activities.

The Court indicates that children can participate in student government, music and drama productions and the like without keeping a C average as is required of their counterparts who participate in interscholastic athletic activities, and possibly cheerleading. My brothers would let a flautist flunk without forfeiting his or her flute. But pity the poor punter who did not pass.

The Court embraces elitism in the name of academic excellence and is focusing too narrowly upon academic or intellectual functions and ignoring, even condemning, other important extracurricular activities. In *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979), we recognized that a thorough and efficient system of schools encompassed an education that develops the minds and bodies of students to prepare them for useful and happy occupations, recreation, and citizenship. Given these broad objectives, why are "mind" building extracurricular activities of higher intrinsic value than "body" developers?

If I were to fashion any rule, it would be that if a student satisfies the State Board's academic and attendance requirements for graduation with his or her class, all school programs would be open. There should be only one class of student. All efforts to emphasize quality and excellence should be promoted and there should be no chains upon children who want to try to make a mark in the world with whatever talents they possess.

Even more troubling is the majority's failure to mention the rank unfairness resulting from the dual policy actions of the State Board and the Kanawha County Board of Education. A student in Kanawha County could not participate in interscholastic activities if he failed to comply with the local board's academic requirements, a C average and no F's, while similarly situated students in every other county in the state could participate who had just the C average. If the State Board of Education had enacted a regulation requiring a C average to participate in extracurricular activities and had added an additional no-F policy applicable only to Kanawha County students, I suggest few lawyers, and probably no lay people, could find any conceivable set of facts to make the regulation rational.

This outright unequal treatment of students by the government is manifestly arbitrary and discriminatory. The state and county policies in tandem are so fundamentally unfair as to violate substantive due process.

But, basically, my dissent is predicated upon what I propose to be the utter non-

sense of the C rule and the F rule: although they sound worthy, their result is to place a higher academic achievement duty upon children who choose to participate in school-related extracurricular activities, than is required of those young people who spend their after-school hours loitering and practicing idleness!

Of course, this is barely a legal argument: school officials are entitled to be just as silly as we are, on occasion. And there has been, since the majority decision, but hardly because of it, moderation of the rules by both the Kanawha County and State boards—one suspects prompted by irate coaches and parents.

It is a pity that Meredith Willson's Professor Harold Hill * and the townspeople of River City could not have an opportunity to persuade my brethren:

"Trouble! Oh we've got trouble. Right here in River City! Right here in River City. With a capital T and that rhymes with P and that stands for Pool. That stands for Pool! We've surely got trouble! We've surely got trouble! Right here in River City! Right here in River City! Gotta figger out a way t'keep the young ones moral after Schooooool."

* M. Willson, *The Music Man,* pp. 38, 39 (1958).