672 S.E.2d 224

**O.J. MAYO, Plaintiff Below, Appellee**

v.

**The WEST VIRGINIA SECONDARY SCHOOLS ACTIVITIES COMMISSION, Defendant Below, Appellant.**

**No. 33838.**

Supreme Court of Appeals of West Virginia.

Submitted: Oct. 7, 2008.

Decided: Nov. 13, 2008.

---

William R. Wooton, The Wooton Law Firm, Beckley, Counsel for the Appellant.

Darrell V. McGraw, Jr., Attorney General, Kelli D. Talbott, Deputy Attorney General, Anthony D. Eates, II, Assistant Attorney General, Charleston, Counsel for Amicus Curiae, West Virginia Board of Education.

Matthew J. Woelfel, Michael A. Woelfel, Woefel & Woelfel LLP, Huntington, Counsel for the Appellee.

Mark A. Sadd, Matthew R. Bowles, Lewis Glasser Casey & Rollins LLP, Charleston, Counsel for Amici Curiae, Charleston Catholic High School and John S. Yelenic, as Superintendent of the Department of Schools of the Roman Catholic Diocese of Wheeling–Charleston.

C. David Morrison, Clarksburg, Counsel for Amicus Curiae, Notre Dame High School.

Robert P. Fitzsimmons, Robert J. Fitzsimmons, Fitzsimmons Law Offices, Wheeling, Counsel for Amicus Curiae, Wheeling Central Catholic High School.

Michael E. Nogay, Sellitti Nogay & McCune, PLLC, Weirton, Counsel for Amicus Curiae, Weirton Madonna Catholic High School.

McHUGH, Senior Status Justice.[1]

The West Virginia Secondary Schools Activities Commission ("SSAC") appeals from the May 21, 2007, order of the Circuit Court of Cabell County, through which the trial court struck down certain legislative rules promulgated by the SSAC as unconstitutional or arbitrary and capricious; ruled that the SSAC is a state agency; and awarded attorney's fees and costs to Appellee O.J. Mayo. The proceeding below was initiated on January 30, 2007, when O.J. Mayo sought an injunction to prohibit enforcement of the two-game suspension he received for committing two technical fouls in an interscholastic basketball contest on January 26, 2007. By the time the trial court held a hearing on February 9, 2007, the matters relating to the injunction had been resolved by agreement of the parties. Despite the resolution of the suspension-related issues, the trial court ruled that SSAC Rule [2] 127-3-8.5,[3] a forfei-

---

1. Pursuant to an administrative order entered on September 11, 2008, the Honorable Thomas E. McHugh, Senior Status Justice, was assigned to sit as a member of the Supreme Court of Appeals of West Virginia commencing September 12, 2008, and continuing until the Chief Justice determines that assistance is no longer necessary, in light of the illness of Justice Joseph P. Albright.

2. For ease of discussion, the legislative rules that were promulgated by the SSAC under authority of West Virginia Code § 18–2–25 (1967) (Repl. Vol. 2008) will be referred to as "SSAC Rules."

ture rule never invoked or at issue in the proceeding below, is unconstitutional; that SSAC Rule 127-3-15.3,[4] a rule proscribing the protest of a contest or ejection, is unconstitutional due to the absence of immediate administrative review following a student's ejection from an athletic contest; that the SSAC is a state agency; and that O.J. Mayo is entitled to an award of attorney's fees and costs. Upon our review of these rulings, we find that the trial court committed error and, accordingly, we reverse.

## I. Factual and Procedural Background

During a basketball game between Huntington High School and Capitol High School on January 26, 2007, O.J. Mayo, a student at Huntington High School, was ejected from the game for committing the second of two technical fouls called against him. Under SSAC rules,[5] a student athlete ejected from a basketball game is automatically suspended for two additional games.[6] Following the ejection, O.J. Mayo approached and had physical contact with a referee. That act required an additional sanction for violating the SSAC rule which prohibits players from "lay[ing] hands" on a referee.[7]

O.J. Mayo instituted a civil action in the circuit court on January 30, 2007, through which he sought injunctive relief to prohibit the SSAC from enforcing the automatic two-game suspension prompted by his ejection from the January 26, 2007, basketball game. By ex parte ruling on that same date, the trial court entered a temporary injunction, the terms of which provided that O.J. Mayo would remain eligible to participate in interscholastic athletics until the matter could be

fully heard. A hearing was set for February 9, 2007.

Before the February hearing was held, the SSAC learned that Huntington High School had decided to subject O.J. Mayo to a fourteen-day suspension for having physical contact with an official. This period of suspension, if implemented, would have made O.J. Mayo ineligible to participate in four basketball games. In view of the action taken by Huntington High School,[8] the SSAC proposed that the temporary injunction be vacated by agreement among the parties. As part of the proposed agreement, the SSAC would defer to Huntington High School on the sanction imposed for the physical contact with a referee and would permit the automatic two-game suspension for the ejection to be served concurrently with the suspension imposed by the school. O.J. Mayo declined to accept the settlement proposal outlined by the SSAC and the matter proceeded to hearing on February 9, 2007.

During a break from the hearing, Huntington High School agreed to decrease the suspension period from fourteen to thirteen days, which had the effect of reducing the number of basketball games missed to only three. As a result, O.J. Mayo decided to accept the SSAC's previous proposal of coterminously serving the school and SSAC suspension periods. The parties then informed the trial court that they had reached an agreement which resolved the merits of the case. Under the agreement, the automatic two-game suspension period stemming from O.J. Mayo's ejection was to be served concurrently with the thirteen-day suspension period imposed by Huntington High

The numerical designation of the "SSAC Rules" is in accord with the title, series, and section number of the rules as they appear in the West Virginia Code of State Regulations.

**3.** *See infra* note 9 for text of SSAC Rule 127-3-8.5.

**4.** *See infra* note 10 for text of SSAC Rule 127-3-15.3.

**5.** Under authority of West Virginia Code § 18-2-25, the SSAC rules are initially proposed by a majority of the SSAC member principals. The proposed rules proceed to consideration by the State Board of Education pursuant to the procedures set forth in the Administrative Procedures

Act, which includes an opportunity for public comment and input. *See* W.Va.Code §§ 29A-3B-1 to—12 (2007) (setting forth procedures for rule making by state board of education). Upon final approval by the State Board of Education, the rules are subject to enforcement by the SSAC as properly promulgated legislative rules.

**6.** *See* W.Va.C.S.R. § 127-4-3.7.3.

**7.** *See* W.Va.C.S.R. § 127-4-3.7.2.

**8.** The trial court noted that "either the school or the WVSSAC can impose sanctions."

School as a sanction for having physical contact with the referee.

The trial court entered an order on April 5, 2007, through which it recited the terms of the parties' agreement. Rather than limiting its ruling to the agreed-upon terms, however, the circuit court proceeded to address the constitutionality of SSAC Rule 127–3–8.5 [9]—a forfeiture rule that was neither mentioned in the pleadings nor raised by any party during the proceeding. The trial court *sua sponte* determined that, excepting those instances where "a judge makes a specific finding in a final determination that the restraining order or injunction was not justified," the forfeiture rule is unconstitutional. *See* W.Va.C.S.R. § 127–3–8.5. As part of its additional rulings, the trial court decided to award attorney's fees and costs to O.J. Mayo.

Following the issuance of the April 5, 2007, ruling, the SSAC filed a motion to alter or amend the ruling. After hearing argument on this issue, the trial court issued an amended order on May 21, 2007. Through this ruling the circuit court: (1) granted O.J. Mayo's request to supplement the record; (2) vacated the injunction entered on January 30, 2007; (3) found SSAC Rule 127–3–8.5 unconstitutional except as it applies to injunctive relief where a trial judge makes a specific finding that the restraining order or injunction was not justified; (4) ruled SSAC Rule 127–3–15.3 [10] unconstitutional based on the lack of administrative review following ejection from an athletic contest; (5) held that the SSAC is a statutorily-created state agency; (6) awarded attorney's fees and costs to O.J. Mayo; and (7) ordered the

SSAC to amend its rules to comport with its rule-related directives.

With the exception of the mandates pertaining to supplementing the record and vacating the temporary injunction, the SSAC seeks a reversal of the relief granted by the trial court through its May 21, 2007, order.

## II. Standard of Review

■ As is our custom concerning matters that are purely legal in nature, our standard of review is plenary. *See* Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995) (holding that "[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review"). Accordingly, we proceed to determine whether the trial court committed error in making the various legal rulings that have been challenged on appeal.

## III. Discussion

### A. Due Process

As an initial matter, we address the trial court's reasoning that the absence of certain due process protections from the SSAC rules impels the conclusion that the rules lack fundamental fairness and therefore run afoul of the constitution. Of specific concern to the trial court was the lack of an opportunity for administrative review before a multigame suspension is imposed as a sanction for violating an SSAC rule. Observing that the SSAC rules do not permit the "protest of a contest or ejection," [11] the trial court ruled that:

> The failure of the WVSSAC to establish an appeal process available before enforce-

---

9. That rule provides:
> 8.5 If a student is ineligible according to WVSSAC rules but is permitted to participate in interscholastic competition contrary to such WVSSAC rules but in accordance with the terms of a court restraining order or injunction and said order or injunction is subsequently vacated, stayed, reversed or finally determined by the courts that injunctive relief is/was not justified, any one of the following actions may be taken in the interest of fairness or restitution to the competing schools.
> 8.5.1 Require that individual or team and performance records achieved during participation by such ineligible student shall be vacated or stricken.

> 8.5.2 Require that team or individual victories shall be forfeited to opponent(s).
> 8.5.3 Require that team or individual awards earned by such individual or team be returned to the Commission.
> W.Va.C.S.R. § 127–3–8.5.

10. That rule provides that "[t]he protest of a contest or ejection will not be allowed. Accordingly, the Board of Directors is not authorized to order contests to be replayed or ejections to be reconsidered." W.Va.C.S.R. § 127–3–15.3.

11. W.Va.C.S.R. § 127–3–15.3.

ment of the punishment is clearly wrong. *The current regulations are repugnant to any notion of due process.* Balancing the mandatory, unreviewable sanction of a multi-contest suspension against the limited resources necessary to ensure equity and an opportunity for a student-athlete to be heard results in this Court's finding that the appeal process is indeed lacking in fundamental fairness. (emphasis supplied).

After making this finding, the trial court purportedly attempted to strike the rule down.[12]

■ Not only do we find it unwise to proceed down the path suggested by the trial court—inviting courts to review an official's judgment call in assessing technical fouls—but the foundational underpinnings upon which the trial court based its rulings on the issue of due process are fatally flawed. In making its ruling, the lower court overlooked this Court's recognition over twenty years ago that " '[p]articipation in interscholastic athletics or other nonacademic extracurricular activities does not rise to the level of a constitutionally protected 'property' or 'liberty' interest.' " *Bailey v. Truby,* 174 W.Va. 8, 21, 321 S.E.2d 302, 316 (1984) (quoting *Clarke v. Board of Regents,* 166 W.Va. 702, 279 S.E.2d 169 (1981)). Because there is no property or liberty interest that attaches to extracurricular activities, "procedural due process protections" do not apply. *Truby,* 174 W.Va. at 21, 321 S.E.2d at 316.

■ As this Court made clear in *Truby,* the absence of a constitutionally protected interest attached to participation in interscholastic sports obviates the necessary predicate for requiring procedural due process protections before instituting SSAC sanctions. Because the due process protections that the trial court found lacking were inapplicable, it follows that the rulings which were premised on the lack of such protections are not sustainable. Thus, the circuit court's attempt[13] to declare SSAC Rule 127–

3–15.3 unconstitutional for lacking an administrative review process before imposing a multi-game suspension sanction is without any basis in the law. Similarly, because the justification for amending the SSAC rules was improper, the trial court's directive to the SSAC to "take steps to amend its rules to conform to this Order" is also set aside.

### B. Forfeiture Rule

■ Of particular concern to the trial court was the possibility that Huntington High School would be forced to forfeit basketball games in which O.J. Mayo had played. The parties, however, are in agreement that the so-called forfeiture rule— SSAC Rule 127-3-8[14]—was never raised in the pleadings or implicated in any fashion during the brief pendency of the case below. When the trial court *sua sponte* addressed that rule, counsel for the SSAC "stated on the record that the forfeiture rule was not an issue in the proceeding, and that, whatever the outcome of this case, the forfeiture rule would not be invoked."

Despite these assurances, the trial court found as follows:

16. Although not mentioned in the Plaintiff's Complaint, the Court expressed deep concern about the possibility of Huntington High School being required under Rule 127–3–8 to forfeit basketball games in which the Plaintiff participated in pursuant to the injunction.

. . . .

28. Therefore, since it is foreseeable that the issue of the possible application of the forfeiture rule to other aggrieved parties who seek a remedy in court will arise again, the Court finds that the question remains justiciable for future guidance and it is appropriate for the Court to rule on this issue. (citation omitted).

As part of the relief granted through its amended order, the trial court determined

---

**12.** We note that while the trial court ostensibly "struck down" SSAC Rule 127–3–15.3 for lack of an administrative review process before imposing a multi-game suspension sanction in the findings portion of the ruling, there is no corollary directive in the portion of the amended order

which sets forth the specific mandates of the ruling.

**13.** *See supra* note 12.

**14.** *See supra* note 9 for the text of the rule.

that the forfeiture rule was unconstitutional "except as it applies to restraining orders or injunctions in which a judge makes a specific finding in a final determination that the restraining order or injunction was not justified."

■ Because the issue of the SSAC forfeiture rule was not before the circuit court, the SSAC argues that the trial court was wrong to address the constitutionality of the rule. It is axiomatic that "a court cannot adjudicate a controversy on its own motion; before it can act there must be proper application invoking the judicial power of the court to litigate the matter at issue." *Board of Educ. v. W. Harley Miller, Inc.,* 159 W.Va. 120, 130, 221 S.E.2d 882, 887 (1975) (Neely, J., concurring). As support for its authority to address the forfeiture rule, the trial court looked to *Israel v. Secondary Schools Activities Commission,* 182 W.Va. 454, 388 S.E.2d 480 (1989), a decision which addresses under what circumstances a court can rule upon technically moot issues. As we held in syllabus point one of *Israel,*

> Three factors to be considered in deciding whether to address technically moot issues are as follows: first, the court will determine whether sufficient collateral consequences will result from determination of the questions presented so as to justify relief; second, while technically moot in the immediate context, questions of great public interest may nevertheless be addressed for the future guidance of the bar and of the public; and third, issues which may be repeatedly presented to the trial court, yet escape review at the appellate level because of their fleeting and determinate nature, may appropriately be decided.

182 W.Va. at 455, 388 S.E.2d at 481.

In stark contrast to how the controversy arose in *Israel*—a direct challenge on equal protection grounds of an SSAC rule prohibiting girls from participating on a boys' team when a separate girls' team existed for that particular sport—the issue of the SSAC forfeiture rule's constitutionality was raised solely by the trial court. And, unlike the compelling public interest in the gender discrimination issues presented in *Israel,* there is arguably minimal public interest in the application of the forfeiture rule. Moreover, as we explained in *Gallery v. Secondary Schools Activities Commission,* 205 W.Va. 364, 518 S.E.2d 368 (1999), the limited record developed on the forfeiture rule prevents us from identifying the scope of any collateral consequences that could result from failing to rule on this issue. *See id.* at 368, 518 S.E.2d at 372 (refusing to decide mooted issue of whether SSAC rules may constitutionally prohibit home-schooled athletes from participating in interscholastic sports given limited record development).[15]

Another compelling reason for not applying *Israel* to this case arises from the fact that while issues centered on sports-team eligibility are ineluctably rendered moot by a student's graduation, the forfeiture rule does not similarly evade judicial review. When properly raised, this issue can be addressed and pursued through the appellate process without concern that mootness will be used to bar judicial review. The absence of controversy surrounding the forfeiture rule in this case combined with the circuit court's improper reliance on *Israel* rendered the trial court's ruling on this issue advisory. *See generally State ex rel. Alsop v. McCartney,* 159 W.Va. 829, 228 S.E.2d 278 (1976) (discussing prerequisites for advisory ruling where case or controversy element of judicial review is missing). While such rulings may be warranted when compelling issues require immediate resolution, no such circumstances are present in this case. Because we determine that the advisory ruling on the forfeiture rule was improper, the trial court's conclusion that the forfeiture rule is unconstitutional is reversed.

### C. State Agency

In its effort to establish a basis for making an award of attorney's fees to O.J. Mayo, the trial court decided to cast the SSAC as an

---

15. This issue was later decided in *Jones v. State Board of Education,* 218 W.Va. 52, 622 S.E.2d 289 (2005), when we upheld the SSAC rule that excludes home-schooled children from participation in interscholastic athletics on both equal protection grounds and legislative rule-making authority.

administrative agency of the state. Setting aside the issue of fees for the moment, we examine whether the trial court erred in ruling that the SSAC is a state agency. In reaching its conclusion, the circuit court credited the Legislature with authorizing the inception of the SSAC; cited the fact that employees of the SSAC are entitled to participate in the West Virginia Public Employees Retirement Fund; and looked to *dicta* in one opinion issued by this Court.

While the trial court wishes to frame the SSAC as an agency whose genesis was solely legislative, this construct does not survive scrutiny. The history of the SSAC reflects that the SSAC has been in existence since 1916 as a voluntary association of high school and middle school principals. *See State ex rel. Secondary School Activities Comm'n v. Oakley,* 152 W.Va. 533, 535, 164 S.E.2d 775, 777 (1968). And although the Legislature enacted a statute in 1967 which includes language indicating that the SSAC "is hereby established," the origin of the SSAC clearly predates the existence of the statute by more than fifty years. W.Va.Code § 18–2–25 (1967) (Repl. Vol. 2008).

In *State ex rel. Manchin v. Secondary School Activities Commission,* 178 W.Va. 699, 364 S.E.2d 25 (1987), when this Court was asked to determine the nature of the funds controlled by the SSAC, we addressed the significance of the "hereby established" language that is contained in West Virginia Code § 18–2–25. Dispelling the suggestion that the SSAC was created as a result of the legislative enactment, we explained that the statute "only accorded statutory recognition to the preexistent organization." 178 W.Va. at 702 n. 9, 364 S.E.2d at 28 n. 9.

█ As support for its conclusion that the SSAC "is a statutorily-created agency of the government," the trial court cites *dicta* from this Court's decision in *Hamilton v. Second-*

ary *Schools Activities Commission,* 182 W.Va. 158, 386 S.E.2d 656 (1989). At issue in *Hamilton* was the impact of an SSAC regulation aimed at preventing "redshirting" [16] on the eligibility of an athlete during his senior year of high school who had been forced to repeat the ninth grade for academic reasons. Because we had ruled in *Oakley* that decisions issued by the SSAC Board of Review were not subject to further review by the West Virginia Supreme Court of Appeals, the Court was attempting to distinguish *Oakley* for the purpose of reaching the merits of the issue presented in *Hamilton. See Oakley,* 152 W.Va. at 539, 164 S.E.2d at 779. With no in-depth discussion,[17] we commented that in *Oakley* we "treated the [Secondary Schools Activity] Commission as simply a private association, not as a statutorily-created agency of the government." *Hamilton,* 182 W.Va. at 160, 386 S.E.2d at 658.

The trial court's decision in the case *sub judice* to elevate that singular reference in *Hamilton,* which is clearly *dictum* in nature, to a legal determination by this judicial body that the SSAC is a state agency is simply erroneous. The SSAC's status was not relevant in *Hamilton.* The "redshirting" rule was determined to be unenforceable for failing to tie ineligibility to those cases involving intentional athletic redshirting. *Id.* at 161, 386 S.E.2d at 659; *see also Oakley,* 152 W.Va. at 538, 164 S.E.2d at 778 (recognizing determination of SSAC's status as voluntary organization or corporation was immaterial to disposition of case). Based on the lack of inquiry into whether an athlete's nonparticipation in sports was intentional as opposed to academic in origin, we concluded that the SSAC redshirting rule exceeded the "Commission's legitimate authority to promulgate 'reasonable' regulations for school sports." *Hamilton,* 182 W.Va. at 161, 386 S.E.2d at 659 (quoting W.Va.Code § 18–2–25); *see also*

---

16. As described in *Hamilton,* "redshirting" is a "scheme" by which athletes are held back in school for a year to allow them to "gain bulk, strength, and maturity" with the objective of boosting the success of the school's sports teams. 182 W.Va. at 160, 386 S.E.2d at 658.

17. Under the law that has been developed since *Oakley* and *Hamilton,* an SSAC rule is subject to

challenge, like all properly promulgated legislative rules, on grounds that it exceeds constitutional or statutory authority and for being arbitrary or capricious. *See Jones,* 218 W.Va. at 61, 622 S.E.2d at 298 (applying Syl. Pt. 4, *Appalachian Power Co. v. State Tax Dep't,* 195 W.Va. 573, 466 S.E.2d 424 (1995)).

*supra* n. 17 (citing authority for challenging legislative rules issued in excess of statutory authority). Moreover, by solely relying on *dicta* in *Hamilton* to support its ruling that the SSAC is a state agency, the trial court was ignoring past decisions of this Court that clearly restrict judicial review of SSAC decisions relating to extracurricular activities.

■ A year after the *Hamilton* decision was issued, this Court adopted a five-part test to identify whether a given entity qualifies as a state agency. In syllabus point one of *Blower v. Educational Broadcasting Authority*, 182 W.Va. 528, 389 S.E.2d 739 (1990), we held:

> In determining whether a particular organization is a state agency, we will examine its legislative framework. In particular, we look to see if its powers are substantially created by the legislature and whether its governing board's composition is prescribed by the legislature. Other significant factors are whether the organization can operate on a statewide basis, whether it is financially dependent on public funds, and whether it is required to deposit its funds in the state treasury.

*Id.* at 529, 389 S.E.2d at 740.

■ Application of the factors articulated in *Blower* to the instant case demonstrates that the SSAC does not qualify as a state agency. The first factor requires an examination of whether the organization's powers are substantially created by the Legislature. As discussed above, the SSAC was in existence for fifty-one years before the enactment of West Virginia Code § 18–2–25. And, while the statute served to recognize the existence of the SSAC, it did not expand the powers exercised by the SSAC during the preceding half-century. As was the case before statutory recognition, the SSAC remains an organization comprised of the vol- untary membership of secondary schools the purpose of which is to control, regulate and supervise interscholastic athletics, as well as other extracurricular activities. *See Oakley*, 152 W.Va. at 538, 164 S.E.2d at 778 (recognizing that notwithstanding incorporation of SSAC under authority of W.Va.Code § 18–2–25, organization *"is still for all intents and purposes in the same position as it has been for the past fifty years"*) (emphasis supplied). Consequently, we are compelled to conclude that the SSAC's powers were not "substantially created by the legislature." *Blower*, 182 W.Va. at 529, 389 S.E.2d at 740, syl. pt. 1, in part.

The second factor announced in *Blower* requires an inquiry into whether the governing board of the SSAC is controlled by the Legislature. The composition of the governing board of the SSAC is prescribed through the bylaws and Constitution of the SSAC. Thus, the Legislature has no control over the makeup of the governing board of the SSAC.

With regard to the third factor of the *Blower* test—whether the organization operates on a statewide basis—this inquiry requires an affirmative answer. Although there is statewide participation in the SSAC, membership in the SSAC is not compulsory. The parties concur that not all middle school and high schools in West Virginia belong to the SSAC.

Application of the fourth factor of *Blower* involves an examination of whether the organization relies on public funds to support its operations. The method by which the SSAC finances its operations is to charge its members dues and to collect admission or entry fees at interscholastic athletic events and interscholastic band events. *See Manchin*, 178 W.Va. at 700, 364 S.E.2d at 26. The SSAC does not receive legislative appropriations. As a result, any reliance on public funds is indirect.[18]

---

18. In briefs filed by the amici curiae, they postulate that the trial court's ruling that the SSAC is a state agency could impel a subsequent related determination of excessive government entanglement with religion or state endorsement of religion in violation of the First Amendment based on the legislative authorization of parochial school participation in the SSAC. *See* W.Va.Code § 18–2–25 (expressly providing for parochial school participation in SSAC). Based on our determination that the SSAC is not a state agency, we do not further address this issue.

The final factor examined under *Blower* is a determination of whether the organization is required to deposit its funds into the state treasury. This issue was settled in *Manchin* in which we held that SSAC funds, while "quasi-public" in nature, are not funds due the state under specific legislative enactment [19] and, consequently, are not required to be deposited into the state treasury. 178 W.Va. at 699, 364 S.E.2d at 25, syl. pt. 1; W.Va.Code § 18–2–25 (characterizing "all moneys paid to such commission [SSAC], as well as moneys derived from any contest or other event . . . [as] quasi-public funds").

 Upon application of the *Blower* test to the question of whether the SSAC is a state agency, only one factor required an affirmative answer. That inquiry, which focused on the state-wide operation of the organization, is not enough to compel a conclusion that the SSAC falls under the state agency rubric. Of more importance is the legislative control of the organization, both in terms of its creation; its powers; its governing board; and its funding. *See also 4–H Road Community Ass'n v. West Virginia Univ. Found.,* 182 W.Va. 434, 388 S.E.2d 308 (1989) (holding that nonprofit corporation formed to assist university's fundraising efforts is not "public body" subject to FOIA because it was not created by state authority and is not primarily funded by state authority). For all intents and purposes, the SSAC operates in an autonomous fashion without legislative control.[20] Accordingly, we hold that under the five-part test adopted by this Court in *Blower,* the SSAC is not a state agency. The ruling of the trial court on this issue is reversed.

### D. Attorney's Fees

 As mentioned above, the trial court attempted to bootstrap the award of attorney's fees to its finding that the SSAC is a state agency.[21] Given our conclusion that the SSAC is not a state agency, the basis upon which the trial court relied to make an award of attorney's fees is nonexistent. As there is neither statutory nor common law authority for the award of attorney's fees and costs in this case, the ruling of the circuit court on this issue is reversed.

Based on the foregoing, the order of the Circuit Court of Cabell County is reversed as to: (1) the ruling that the lack of administrative review prior to imposition of a multi-game suspension under the SSAC rules is unconstitutional; (2) the directives requiring that the SSAC amend its rules to conform with the trial court's order; (3) the ruling that the SSAC forfeiture rule is unconstitutional; (4) the ruling that the SSAC is a state agency; and (5) the award of attorney's fees and costs to the plaintiff below.

Reversed.

Justice ALBRIGHT not participating.

Senior Status Justice McHUGH sitting by temporary assignment.

19. *See* W.Va.Code § 12–2–2 (1997) (Repl. Vol. 2004).

20. As to the argument that SSAC employees participate in the West Virginia Public Employees Retirement System, that singular fact does not render the organization a state agency. As the SSAC observes, various entities that are not state agencies are allowed to participate in public retirement programs. Among them are the West Virginia Association of Counties; the West Virginia Municipal League; and the County Commissioners' Association. Additional examples include the participation of the President of the West Virginia Education Association and the President of the American Federation of Teachers for West Virginia in the West Virginia Teacher's Retirement System. The fact of this participation, however, does not transform either organization into a state agency.

21. As the basis for its award, the trial court cited this Court's inapposite ruling in *State ex rel. West Virginia Highlands Conservancy, Inc. v. West Virginia Division of Environmental Protection,* 193 W.Va. 650, 458 S.E.2d 88 (1995), in which we recognized that costs and attorney's fees may be awarded in mandamus proceedings which are instituted to compel public officials to perform a mandatory duty.