717 S.E.2d 859

STATE of West Virginia ex rel. the WEST VIRGINIA SECONDARY SCHOOL ACTIVITY COMMISSION, et al., Petitioners

v.

Honorable Carrie WEBSTER, Judge of the Circuit Court of Kanawha County, Tyler Harris, Laura Stephens, Pierria Henry, Maria Reese Terrill, Trevond Reese and Emerson Gagnon, Respondents.

Brooke County Board of Education, Intervenor.

No. 10–4001.

Supreme Court of Appeals of West Virginia.

Submitted Dec. 7, 2010.

Decided Feb. 24, 2011.

William R. Wooton, The Wooton Law Firm, Beckley, WV, for the Petitioners.

David F. Cross, Wellsburg, WV, Michael G. Simon, S. David Wilharm, Frankovitch, Anetakis, Colantonio & Simon, Weirton, WV, Michael E. Nogay, Sellitti, Nogay & McCune, Weirton, WV, for the Intervenor, Brooke County Board of Education.

C. Benjamin Salango, Preston & Salango, PLLC, Charleston, WV, for the Individual Respondents.

Patrick J. O'Reilly, South Charleston, WV, Amicus Curiae, Pro Se.

McHUGH, Justice:

Petitioners The West Virginia Secondary School Activities Commission ("SSAC" or "WVSSAC") sought a writ of prohibition in

connection with the November 30, 2010, issuance of a preliminary injunction by the Circuit Court of Kanawha County through which Respondents, four South Charleston High School football players,[1] were declared eligible to participate in the AAA state championship game.[2] By its grant of extraordinary relief, the trial court prevented the implementation of a one-game suspension that the SSAC had imposed against the respondent football players for engaging in unsportsmanlike conduct in violation of SSAC rules.[3] Given the need for a prompt resolution of the matter,[4] this Court issued a writ of prohibition on December 7, 2010, through which we announced our decision that the lower court had exceeded its authority in issuing extraordinary relief to the respondent players. We now address these issues in full.

## I. Factual and Procedural Background

With only fourteen seconds left in a AAA football playoff game on November 19, 2010, a player for South Charleston High School ("South Charleston") intercepted a pass thrown by the Hurricane High School ("Hurricane") quarterback. Immediately after the interception, a Hurricane player threw several punches at a South Charleston player and then a number of players from both teams joined the melee on the field. Despite the remaining time on the clock, a decision was made to call the game[5] due to the undeniably charged atmosphere and a resultant concern for the safety of everyone involved.[6]

Following the decision to call the game and when everyone was still on the field, the coaches made repeated inquiries of the game officials to identify which players were ejected because of the fighting incident. David Hume, the back judge on the officiating crew, responded to the coaches by stating that he had South Charleston players number 1 and 15 noted as ejected on his card. At this point, law enforcement officials ordered the officials to exit the field and go to their locker room for safety reasons.[7]

When the officials convened in their locker room, David Hume rechecked his game card and realized that he had misread the number 7 on his card for a 1. In explanation of this mistake, he stated that he read the numeral incorrectly due to the chaos of the pepper spraying[8] and because it was written over a preprinted horizontal line on the game card. He immediately advised his fellow officials that he had ejected South Charleston player number 7 and not number 1. On the game card of the referee, Keith DeVault, he listed numbers 5, 7, 11, and 12 (the respondent players) as the South Charleston players he had ejected for fighting. In the special report that the game officials jointly sent to the SSAC at 10:21 a.m. on Saturday, November 20, 2010, the four respondent football players (Nos. 5, 7, 11, and 12) were identified as the South Charleston players ejected from the game for their involvement in the fight.[9]

Based on the special report submitted by the game officials, the SSAC suspended the respondent players from the next football game to be played—the AAA semifinal game against Brooke High School on Saturday,

1. Those players were Tyler Harris, Pierria Henry, Trevond Reese, and Emerson Gagnon.

2. The circuit court had entered a temporary restraining order on November 23, 2010, with regard to the SSAC's determination that the subject football players were ineligible for participation in the AAA state championship game.

3. *See* 127 C.S.R. § 4–3.7.3.

4. Contributing to the need for an accelerated ruling was the issuance of a ruling by the Circuit Court of Brooke County on November 30, 2010, postponing the AAA state championship football game scheduled for December 4, 2010, pending a final determination of the validity of the SSAC's suspension of the respondent players.

5. Both coaches requested that the game be terminated.

6. Law enforcement personnel came onto the field and used pepper spray to gain control of the situation. Three of the five game officials were doused with pepper spray.

7. Although the coaches were invited to join the officials in their assigned locker room to find out which players were ejected, the South Charleston coach chose to remain with his team in its locker room.

8. The Special Report filed by the officials with the SSAC states: "We missed some players because the police came onto the field and pepper sprayed all the players including three officials."

9. The report also identified four Hurricane players who were similarly ejected for participating in the fight that ensued on the field.

November 27, 2010. In response to the SSAC suspension, the respondent players sought a temporary restraining order from the circuit court.[10] As support for the requested relief, the South Charleston players argued that the officials improperly identified the players to be suspended after the game had ended and, further, that the SSAC ruling was arbitrary and capricious and in violation of statutory authority.

Following an *ex parte* hearing on November 23, 2010, the circuit court granted a temporary restraining order with regard to the SSAC's suspension of the subject football players. Through its ruling, the trial court directed that "Tyler Harris, Pierria Henry, Trevond Reese, and Emerson Gagnon shall remain eligible to participate in interscholastic athletics until further order of the Court and until this matter may be fully heard." The SSAC filed a motion to dissolve the temporary restraining order on November 26, 2010. On Saturday, November 27, 2010, the respondent football players participated in the AAA semifinal game when South Charleston played and defeated Brooke High School by a score of 29–28.

On Monday, November 29, 2010, the circuit court held an evidentiary hearing on the respondents' request for injunctive relief.[11] Testimony was taken from numerous witnesses, including two of the officials from the November 19, 2010, football game. Based on its conclusion that the game officials violated SSAC rules by failing to eject the subject football players during the football game, the circuit court granted a preliminary injunction by order entered on November 30, 2010.[12]

In a separate but related matter, the Circuit Court of Brooke County granted a temporary restraining order on November 30, 2010, directing that the "State Championship football game for the AAA division of the State of West Virginia shall not be played until such time as the disciplinary action

against South Charleston High School by the WVSSAC be considered final and that all legal action concerning this matter be legally concluded." Prohibiting the SSAC from canceling the 2010 Class AAA state football championship game, the Brooke County Circuit Court directed that the game be rescheduled "as soon as practicable following the conclusion of all of the litigation and disciplinary actions of the WVSSAC."

On December 2, 2010, the SSAC filed a petition with this Court through which it sought a writ of prohibition to prevent enforcement of the preliminary injunction issued by the Circuit Court of Kanawha County. Based on the ruling issued by the Brooke County Circuit Court postponing the AAA state championship game pending final resolution of the SSAC's suspension decision, the Brooke County Board of Education sought to intervene in this matter.

By order entered on December 7, 2010, this Court issued a writ of prohibition against the circuit court judge to prevent enforcement of the temporary restraining order and the preliminary injunction at issue after determining that both of those rulings were an improper exercise of the trial court's authority. Allowing the Brooke County Board of Education ("Board") to intervene in the matter, we declared that upon this Court's grant of extraordinary relief to the SSAC the actions initiated by the respondent players to prevent enforcement of the SSAC's disciplinary action became final. We further ruled that "[a]ny determination as to whether a forfeiture is required in connection with the participation of the South Charleston High School football players subject to this matter in the playoff game held on November 27, 2010, must be resolved solely by the governing body, the WVSSAC, and is clearly outside the jurisdiction of this Court and any other court, including the Brooke County Circuit Court." [13]

---

**10.** The SSAC's suspension decision was announced on Monday, November 22, 2010, and the respondent player's motion for a temporary restraining order was filed on November 23, 2010.

**11.** While the Brooke County Board of Education sought to intervene in the proceedings below by motion filed on November 29, 2010, it does not

appear that the trial court ruled upon that motion.

**12.** The trial court determined that the SSAC's motion to dissolve the temporary restraining order was mooted by its ruling that the suspension was invalid.

**13.** After this Court issued its writ of prohibition, the SSAC quickly announced that by allowing the

## II. Standard of Review

■ The SSAC contends that the trial court acted in excess of its authority when it initially issued a temporary restraining order and later when it issued a preliminary injunction in connection with the SSAC's suspension of the respondent players. The standard by which we determine whether a trial court exceeded its legitimate powers is set forth in syllabus point four of *State ex rel. Hoover v. Berger*, 199 W.Va. 12, 483 S.E.2d 12 (1996):

> In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

With these standards in mind, we proceed to determine whether the SSAC has established the necessary grounds for a writ of prohibition.

## III. Discussion

■ In explanation of its decision to issue the preliminary injunction, the trial court "recognize[d] that it has limited jurisdiction with respect to review of matters involving the WVSSAC, and generally will not interfere with the internal affairs of a voluntary association and ordinarily [will] refrain from reviewing its decisions." This statement is in accord with our holding in syllabus point two of *State ex rel. WVSSAC v. Oakley*, 152 W.Va. 533, 164 S.E.2d 775 (1968): "As a general rule courts should not interfere with the internal affairs of school activities commissions or associations." In justification of its involvement in the SSAC suspension ruling at issue, the trial court declared that it had authority to issue a preliminary injunction because "the WVSSAC [had] exceed[ed] its legitimate authority."

While the trial court cited our decisions in *Hamilton v. WVSSAC*, 182 W.Va. 158, 386 S.E.2d 656 (1989), and *Mayo v. WVSSAC*, 223 W.Va. 88, 672 S.E.2d 224 (2008), as support for its intervention in the SSAC matter, the lower court overlooked significant language from both those decisions that specifically identifies the abuse of the SSAC's *rule-making* authority [14] as the basis for court intervention into matters that otherwise operate without judicial review. *See Oakley*, 152 W.Va. at 538, 164 S.E.2d at 779 (recognizing that, as a rule, courts have no right of review with regard to SSAC decisions). A careful reading of both *Hamilton* and *Mayo* reveals that the authority of a court to inject itself into an SSAC matter arises when that body exceeds its legitimate rule-making authority.

At issue in *Hamilton* was an SSAC eligibility rule that was aimed at preventing "redshirting," or intentionally sidelining an athlete for physical growth purposes to enhance

---

respondent players to participate in the semifinal game in violation of the SSAC's suspension decision, South Charleston had forfeited its right to play in the AAA state championship football game. *See* 127 C.S.R. § 3–8.

**14.** *See* W.Va.Code § 18–2–25 (2008) (providing that SSAC "shall promulgate reasonable rules and regulations providing for the control, supervision and regulation of the interscholastic ath-

letic events" in public secondary schools as well as those private and parochial secondary schools that elect to be members of the SSAC); *Jones v. West Virginia State Bd. of Educ.*, 218 W.Va. 52, 62, 622 S.E.2d 289, 299 (2005) (acknowledging that legislative grant of rule making authority to SSAC for "control, supervision and regulation of the interscholastic athletic events" is undeniably clear).

the performance of a school's sports teams. The football player affected by the eligibility rule in *Hamilton* was ineligible to play for purely academic reasons and not because he had been intentionally redshirted. 182 W.Va. at 160–61, 386 S.E.2d at 658–59. In concluding that the red-shirting rule exceeded the SSAC's "legitimate authority to promulgate 'reasonable' regulations for school sports," we determined that the rule, while aimed at a legitimate purpose, was not reasonably designed to address only those situations where someone was intentionally redshirted and that the prevention of red-shirting could be "accomplished in a more reasonable and less restrictive way." *Id.* at 161, 386 S.E.2d at 659.

In *Mayo*, this Court reversed the trial court's decision that the SSAC rules pertaining to forfeiture and prohibiting the protest of an ejection were unconstitutional. 223 W.Va. at 97, 672 S.E.2d at 233. Because the forfeiture rule had never been invoked or raised by the parties in any fashion in *Mayo*, the trial court's determination on this issue was deemed an improper advisory ruling. *Id.* at 94, 672 S.E.2d at 230. Bothered by the lack of administrative review prior to the SSAC's imposition of a multi-game sanction, the trial court relied upon the absence of due process as the basis for its finding that the SSAC non-protest rule was unconstitutional. But, as we explained in *Mayo*, the due process protections the trial court sought to impose on the regulation of interscholastic athletics were not applicable. Those protections stem from a constitutionally protected property or liberty interest, neither of which are extant in interscholastic athletics or other extracurricular activities. *Id.* at 93, 672 S.E.2d at 229. In discussing the issue of whether the SSAC is a state agency,[15] we made the following observation in *Mayo:* "Under the law that has been developed since *Oakley* and *Hamilton*, an SSAC rule is subject to challenge, like all properly promulgated legislative rules, on grounds that it

exceeds constitutional or statutory authority and for being arbitrary or capricious."[16] 223 W.Va. at 95 n. 17, 672 S.E.2d at 231 n. 17; *see* Syl. Pt. 4, in part, *Appalachian Power Co. v. State Tax Dep't*, 195 W.Va. 573, 466 S.E.2d 424 (holding that "[a]s a properly promulgated legislative rule, the rule can be ignored only if the agency has exceeded its constitutional or statutory authority or is arbitrary or capricious").

Relying on the above-cited footnote from *Mayo* as the fulcrum of its decision, the trial court reasoned: "[A]fter the *Mayo* decision", "the unreasonable promulgation *or application* of a WVSSAC rule may still be challenged." (Emphasis supplied). Critically, the trial court's conclusion—that courts are entitled to examine the SSAC's application of its rules—does not follow from our recognition in *Mayo* of the three grounds for challenging a properly promulgated legislative rule. 223 W.Va. at 95 n. 17, 672 S.E.2d at 231 n. 17. Nothing in the jurisprudence of this Court supports the trial court's foundational premise that courts are permitted to second guess the manner in which the SSAC applies its rules.

In concluding that the SSAC had exceeded its authority, the trial court reviewed the official football rules published by the National Federation of State High School Associations ("NFHS"), the official contest rules relied upon by the SSAC.[17] At the center of its focus was Rule 1, which provides: "The game officials shall assume authority for the contest, including penalizing unsportsmanlike acts, 30 minutes prior to the scheduled game time ... [and][t]he officials' jurisdiction extends through the referee's declaration of the end of the fourth period or overtime."[18] Because the ejections that were reported to the SSAC were not announced on the field before the game was called, the trial court concluded that the officials lacked authority to make those ejections. Reasoning that the

---

**15.** In syllabus point three of *Mayo*, we held that the SSAC is not a state agency. 223 W.Va. at 90, 672 S.E.2d at 226.

**16.** This footnote, in modified form, was relied upon by the trial court as the necessary authority for its decision to issue the preliminary injunction at issue.

**17.** *See* 127 C.S.R. § 3–15 ("The current edition of official High School Rules published by the National Federation of State High School Associations will be the official rules used in contests, meets, and tournaments played by members of this Commission.").

**18.** 2010 NFHS Football Rules, Rule 1, art. 7, 8.

"WVSSAC's power to suspend a player is limited to the ejection call made by the official on the field," the trial court ruled that the officials and the SSAC both violated Rule 1 of the NFHS football rules. The trial court took the position that once the game was over, only the school principal, and not the SSAC, had the right to make a suspension ruling.[19] The trial court opined that "inconsistent reports untimely filed during and after expiration of the twenty four hour period" resulted "in an arbitrary and capricious application of an otherwise reasonable Rule [1]."

As an initial matter, we observe that Rule 1 of the NFHS football rules, which the trial court found the officials and the SSAC to have violated, is not a rule that was promulgated pursuant to the authority granted the SSAC by West Virginia Code § 18–2–25.[20] Because the NFHS rules were not promulgated by the SSAC, those rules are not subject to the same type of judicial scrutiny as legislative rules that are promulgated by the SSAC under authority of West Virginia Code § 18–2–25. *See Appalachian Power*, 195 W.Va. 573, 466 S.E.2d 424, syl. pt. 4, in part. We proceed to determine whether the trial court erred in ruling that the SSAC acted without authority in suspending the respondent players.

Under SSAC rules, member schools are subject to the rule that requires "all relations with other schools," including participation in athletic contests, to be conducted "in a spirit of good sportsmanship." 127 C.S.R. § 4–2.1. Failure to abide by this rule of good sportsmanship carries the specific penalty of ejection from the game in which the unsportsmanlike conduct occurred along with prohibition from participating in "the next regularly scheduled contest(s)." 127 C.S.R. § 4–2.3. In addition to the general

requirement of good sportsmanship, SSAC rules specifically address the situation when a player "strikes an opponent, coach, or a spectator during or following an athletic event." Under 127 C.S.R. § 4–3.7.2, that type of conduct permits either the principal *or the WVSSAC* to declare a player ineligible for participation "for a specified period of time up to one year, depending on the seriousness of the act." The SSAC rules further provide that "[a]ny coach, student, or bench personnel ejected by an official will be suspended for the remainder of the game, match, meet or contest" and "will also face suspension in additional contest(s)." 127 C.S.R. § 4–3.7.3.

Under SSAC rules, "[u]nsportsmanship action must be reported in detail to the WVSSAC." 127 C.S.R. § 4–3.8. To facilitate the reporting of such conduct, the SSAC has developed a form entitled "Special Report" that game officials are required to submit to both the school principal and the SSAC. While the SSAC rules do not specify the time period in which these Special Reports are to be submitted, the form itself indicates that it "must be filed by the official within twenty-four hours following the incident."[21] In this case, there was an initial Special Report filed within the prescribed twenty-four hour post-game period at 10:21 a.m. on Saturday, November 20, 2010. That particular Special Report identified player numbers 5, 7, 11, and 12 for South Charleston as well as certain Hurricane players as having participated in the on-field fight.[22] A second Special Report was submitted outside the specified twenty-four hour period as it was filed on Sunday, November 21, 2010, at 4:44 p.m. That second report included the number of an additional South Charleston player as participating in the on-field fight, but that player

19. The trial court cited 127 C.S.R. § 3–2.6 as authority for this conclusion. That regulation provides that the "principal has the right to exclude a contestant who would not represent his school in an appropriate manner, a student who fails to maintain a satisfactory scholastic standing, or a student who has been excluded for a serious illness or injury."

20. *See supra* note 14.

21. When asked at the hearing on the preliminary injunction whether there was a specified time period in which game officials were required to submit the Special Reports, Gary Ray, the Executive Director of the WVSSAC, testified that the twenty-four hour period specified on the form was included to encourage the officials to submit the reports in a "timely fashion."

22. The numbers of the Hurricane players included on the Special Report were redacted on the documents included in the record of this case.

was not one of the players who was ultimately suspended by the SSAC.[23]

While counsel for the respondent players initially represented to the trial court that the Special Report containing the numbers of the South Charleston players who were suspended was submitted outside the twenty-four hour period designated on the report, this averment was ultimately retracted.[24] The record confirms that the initial Special Report, which contains the numbers of the respondent players, was submitted within twenty-four hours after the game.[25] Not only did Respondents concede that the initial Special Report complied with the stated time period on the form, but they specifically averred in their response to the SSAC's Motion to Dissolve the TRO that their "prayer for injunctive relief is not premised upon the timing of the Special Reports." In light of the undisputed timely submission of the initial and only Special Report that was apparently relied upon by the SSAC coupled with Respondents' stated decision to forego timeliness as a basis for seeking extraordinary relief, the trial court's reliance on the "untimely fil[ing]" of the Special Reports as a basis for its relief was improper.

Because the respondent players were not ejected until after the game had been officially called, the trial court concluded that the respondent players were wrongly ejected by the game officials and, thus, improperly suspended by the SSAC. The trial court, as discussed above, looked to Rule 1 of the NFHS Rules to reach this conclusion. From our review of the record of this matter, the trial court arguably interpreted the term "jurisdiction," as it is used in Rule 1,[26] in an overly legalistic manner and also failed to consider the unique extenuating circumstances of this particular football game.

With regard to the trial court's position that the calling of the game terminated the authority of the game officials to make their ejection decisions, this conclusion simply does not withstand scrutiny.

Seeking to apply the NFHS Rules in a virtual vacuum, independent from the realities of the electric atmosphere that existed on the field, the trial court placed undue emphasis on the language of Rule 1 which provides that the game officials have authority over the field and players "through" the end of the contest. The trial court seemingly faults the officials for calling the game and obeying the directives of law enforcement to clear the field. Implicit in the trial court's ruling is the conclusion that to comply with both the NFHS and SSAC rules, the game officials had to opt not to call the game and remain on the field to announce which players were ejected for participating in the on-field fight. Not only is this conclusion not supported by the rules, but it reflects a failure to fully consider and appreciate the events that had just transpired on the field.

In marked contrast to the trial court's interpretation of the subject rules, the duties and/or authority of the game official do not automatically cease with the running of the game clock. When asked whether the ending of the game terminated the authority of the officials at the hearing on the preliminary injunction, Michael Webb, the football clinician for the SSAC and rules interpreter, who serves as the SSAC's rules representative on the National Federation of High School Football Rules Committee, testified: "No, sir, it does not. Their jurisdiction extends through the end of the game, and then as they leave the field the jurisdiction is extended until they finish their duties. In this case,

**23.** On the record of this case, we are unable to determine whether the reason player (no. 15) was not among the players suspended by the SSAC was due to fact the Special Report was submitted after the twenty-four hour period or because of some other reason. Given the testimony of Gary Ray with regard to the advisory nature of the twenty-four hour time period for submitting Special Reports, it appears that a reason other than the "late" submission controlled the determination. *See supra* note 21.

**24.** In explanation of the misrepresentation, Respondents' counsel stated that the hard copy of

the reports he was provided by his clients differed from the electronic version of the reports he later received with regard to the date and time the reports were respectively submitted.

**25.** It was submitted at 10:21 on the day immediately following the game.

**26.** "The officials' jurisdiction extends through the referee's declaration of the end of the fourth period or overtime." 2010 NFHS Football Rules, Rule 1, art. 8.

writing up the report and all that stuff for the governing body, which is the SSAC." It stands to reason that the performance of duties that flow directly from the on-field officiating fall within the "jurisdiction" or authority of the officiating position. To suggest otherwise is to deny both the realities of athletic competitions and the post-game tasks the officials are routinely required to complete.

In the immediate aftermath of the on-field altercation, a consensus was reached by the officials and the coaches that the game should not continue. Given the circumstances of this particular game, the post-game identification of the players to be ejected for participating in the fight was clearly reasonable and not outside the authority of the game officials.[27] There is no provision in the NFHS football rules or the SSAC rules that requires an ejection to be verbally announced on the field. Because the game had ended immediately after the fight, there was no opportunity for the ejections to have been made before the end of the contest. The respondent players who were suspended by the SSAC for participating in the on-field fight were identified within the initial Special Report that was filed within the twenty-four hour period following the game.[28]

■ The trial court's conclusion that the "WVSSAC's power to suspend a player is limited to the ejection call made by the official on the field" is clearly erroneous. Not only is there no basis in the rules for this conclusion[29] but the trial court clearly overlooked the regulation, 127 C.S.R. § 4–3.7.2, which gives either a principal or the SSAC the necessary authority to declare a player ineligible for, *inter alia*, striking an opponent during or following an athletic event. This power to declare a player ineligible, which

has the same effect as a suspension, exists independent of an ejection ruling. In addition, we find no basis for the trial court's conclusion that the SSAC failed to follow its own rules with regard to the ejections of the South Charleston players.[30] The SSAC acted within its authority in suspending the respondent players under either 127 C.S.R. § 4–3.7.2 for striking an opponent or under 4–3.7.3 as an enhanced punishment for being ejected for unsportsmanlike conduct.

Having determined that the SSAC's suspension of the respondent players was valid, we return to the overarching issue of whether the trial court wrongly invaded the province of the SSAC with regard to its examination of the SSAC's compliance with its own rules. Arguing that the circuit court lacks the authority to determine whether game officials complied with *any* rule, the Intervenor Board posits that it "is within the sole discretion and authority of the WVSSAC and its Executive Director to determine whether or not game 'Special Reports' were filed in a manner which complied with" the requirements "of the WVSSAC Officials' Handbook." We agree. For the same reasons that judicial review was not warranted with regard to an official's call in *Mayo*, there was no basis for the trial court's involvement in this case. *See* 223 W.Va. at 93, 672 S.E.2d at 229. As we sought to make clear in *Mayo*, the trial courts of this state have no business invading the legislative grant of authority given to the SSAC with regard to interscholastic sports.

■ Coincident with the legislative grant of authority to the SSAC to "exercise the control, supervision and regulation of all interscholastic athletic events," matters fall-

27. Article 6 of Rule 1 of the NFHS football rules expressly provides that the "referee has authority to rule promptly, and in the spirit of good sportsmanship, on any situation not specifically covered in the rules."

28. While respondent players and the trial court took issue with the filing of subsequent Special Reports, those submissions have no bearing on the issue of whether the respondent players were ejected and/or suspended pursuant to the applicable rules.

29. The trial court's reliance on 127 C.S.R. § 3–2.6 is clearly misplaced as that regulation ad-

dresses the general authority of a principal to keep a particular student from participating in school sports for injury or illness; poor academic performance; or failing to properly represent the school.

30. While the trial court in its order cites to 127 C.S.R. § 3–8.6, in saying that the ejection "was not handled 'according to WVSSAC rules,'" it appears that the intended reference was to § 3–9.6, which requires compliance with the governing rules.

ing within the province of the SSAC's bailiwick are, as a rule, beyond the purview of court interference. W.Va.Code § 18–2–25; *see Oakley,* 152 W.Va. 533, 164 S.E.2d 775, syl. pt. 2. While there are limited occasions where review is permitted, such as a well-founded challenge to a legislative rule promulgated by the SSAC,[31] this case clearly does not present a situation where court review was proper. Critically, no one has suggested that the SSAC rules,[32] which permit suspensions for unsportsmanlike conduct and striking an opponent, are an unreasonable exercise of the legislative grant of rule-making authority to the SSAC. *See* W.Va. Code § 18–2–25; *Hamilton,* 182 W.Va. at 161, 386 S.E.2d at 659. Unlike the scenario presented in *Hamilton,* where the rule under specific challenge was determined to be unreasonable when its effect was examined in light of its purpose, there was no claim in this case that the ejection or suspension rules were unreasonable, arbitrary, or capricious.[33] Because no allegation was ever asserted by the respondent players that the rules were an unreasonable exercise of the SSAC's authority, the trial court had no basis for injecting itself into this matter. In the interest of avoiding prospective instances of improper judicial review of matters expressly reserved to the SSAC, we hold that decisions properly within the purview of the legislative grant of authority to the WVSSAC under West Virginia Code § 18–2–25, such as the application of WVSSAC Rules and the review of calls or rulings made by game officials, are not subject to judicial review.

By superimposing its judgment on how the SSAC *applied* its own rules with regard to handling ejections and suspensions, the trial court exceeded its jurisdiction. Simply put, the trial court lacked any authority to engage in a review of the SSAC's decision to suspend the respondent players pursuant to its properly promulgated rules. As a result of that improper exercise of jurisdiction, the SSAC is entitled to a writ of prohibition. *See Hoover,* 199 W.Va. 12, 483 S.E.2d 12, syl. pt. 4;

*accord Oakley,* 152 W.Va. at 540, 164 S.E.2d at 779.

Having determined that the trial court exceeded its authority in issuing both the temporary restraining order and the preliminary injunction, a writ of prohibition was previously entered by order of this Court on December 7, 2010, and the mandate was contemporaneously issued with that prior ruling.

Writ granted.

---

**31.** In this case, the rule that the trial court focused upon—Rule 1 of the NFHS football rules—was not even a rule promulgated by the SSAC.

**32.** 127 C.S.R. § 4–3.7.2; 4–3.7.3.

**33.** What the trial court ruled was that the game officials' "application" of Rule 1 of the NFHS football rules was arbitrary and capricious. That is a call reserved to the SSAC, not the courts.